799 A.2d 1264

Noel S. LIVERPOOL

v.

BALTIMORE DIAMOND EXCHANGE
INC., d/b/a Radcliffe Jewelers.

No. 89, Sept. Term, 2001.

Court of Appeals of Maryland.

June 11, 2002.

John E. Gallagher (Gallagher & Hansen L.L.P. of Catons-ville, Robert Jay Feldman, Towson,) on brief, for petitioner.

Daniel J. Hanley (Patrick D. Hanley of Hanley & Hanley, on brief), Towson, for respondent.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

This case was initiated by Noel S. Liverpool, Petitioner, against Baltimore Diamond Exchange, Inc., d/b/a Radcliffe Jewelers, Respondent, as a civil action in the District Court of Maryland, sitting in Baltimore County. Petitioner's complaint for money damages was based on Respondent's alleged violations of the Maryland Layaway Sales Act ("the Act"), codified in Maryland Code (1978, 1990 Repl.Vol.), Commercial Law Article, §§ 14–1101–14–1110.[1] The instant case requires that we address the construction and interpretation of the Act for the first time since its enactment in 1978.

The issue here is whether Petitioner's purchase in October 1998 of a certain watch from Respondent's jewelry store constituted a layaway agreement subject to the obligations and remedies provided under the Act.[2] After a bench trial on 2 November 2000, the District Court judge found that the disputed sales transaction constituted a "bona fide C.O.D. transaction" as defined by the Act and, as such, was expressly excluded from the additional protections afforded under the Act by virtue of § 14–1101(g)(3), which provides that a laya-

---

1. Unless otherwise indicated, all statutory citations herein are to Md. Code (1978, 1990 Repl.Vol.), Commercial Law Article, §§ 14–1101–14–1110. The Maryland Layaway Sales Act ("the Act") is presently codified in Md.Code (1978, 2000 Repl.Vol.), Commercial Law Art., §§ 14–1101–14–1110.

2. The sales transaction in the instant case is governed by the Maryland Uniform Commercial Code ("the U.C.C."), which is presently codified at Md.Code (1975, 2002 Repl.Vol.), Commercial Law Art., §§ 1–101–10–112. Unless otherwise indicated, all statutory citations herein concerning the U.C.C. are to Md.Code (1975, 1997 Repl.Vol., 1998 Supp.), Commercial Law Art., §§ 1–101–10–112. *See* § 2–102 (stating that Title 2, the Sales Article of the U.C.C., applies to "transactions in goods," *separately defining* "goods" in § 2–105(1) as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...."). At issue is whether Petitioner is afforded the additional protection provided consumers under the Layaway Sales Act.

way agreement "does not include a bona fide C.O.D. transaction."[3] Concluding that the Act did not apply under the circumstances, the trial judge deducted Respondent's lost profit from Petitioner's down payment of $4,620, and entered a judgment in Petitioner's favor for the balance in the amount of $2,870, together with costs.

Petitioner noted a timely appeal to the Circuit Court for Baltimore County, pursuant to Maryland Rule 7–103[4] and Md.Code (1998 Repl.Vol., 2001 Supp.), Courts & Judicial Proceedings Art., § 12–403(a),[5] alleging that the trial judge erred as a matter of law by mis-characterizing the sale as an exempt "C.O.D. transaction." The Circuit Court affirmed the District Court's judgment.

We granted Petitioner's timely petition for writ of certiorari, *Liverpool v. Balt. Diamond Exch., Inc., d/b/a Radcliffe Jewelers*, 366 Md. 274, 783 A.2d 653 (2001), which raised the following questions:

    (1) Does an agreement for the sale of consumer goods, which satisfies the definition of a "special order transac-

---

**3.** The District Court judge's oral ruling does not appear in the transcript of the trial proceeding, as the tape recording "abruptly" and inexplicably ended prior to rendition of her oral decision. For appellate purposes, the parties stipulated that the trial judge determined that the transaction was subject to the C.O.D. exclusion. *See* § 14–1101(g)(3). On appeal, the Circuit Court judge, in her Memorandum Opinion, found that the trial judge "concluded ... that this was a special order item, and that the transaction was properly characterized as a C.O.D. transaction," and "therefore was not governed by the Layaway Sales Act." *See Bradley v. Hazard Tech.*, 340 Md. 202, 211, 665 A.2d 1050, 1055 (1995) (noting that "[i]f the circuit court finds that a record sufficient for a fair consideration of the appellate issues can be reconstructed, the appeal should proceed on that record."). *See also* Maryland Rule 7–113(b)(1)(A) (permitting parties to proceed on appeal by stipulation in the Circuit Court based on only that portion of the testimony they agree is relevant to the appeal).

**4.** Maryland Rule 7–103 details the method of securing appellate review in the circuit court.

**5.** Md.Code (1998 Repl.Vol., 2001 Supp.), Courts & Judicial Proceedings Art., § 12–403(a) states that, "[a]n appeal from the District Court sitting in one of the counties shall be taken to the circuit court of the county in which judgment was entered."

tion," also have to satisfy the definition of a "layaway agreement" in order to be protected by the Maryland Layaway Sales Act?

(2) Can an agreement that satisfies the definition of a "special order transaction" also constitute a "C.O.D. transaction"?

## The Record

We recount the underlying facts as reviewed by the Circuit Court:

This appeal arises from an October 22, 1998 transaction Mr. Liverpool conducted at The Baltimore Diamond Exchange, doing business as Radcliffe Jewelers ("Radcliffe's") in Towsontowne Center, while shopping for a Christmas present for his wife. Mr. Liverpool selected a Philippe Charriol[6] watch from a catalogue of goods sold at Radcliffe's. Although the price listed in the catalogue was $10,500, Mr. Liverpool negotiated the price down to $7,000. Because the item had to be special ordered, he was told he had to put down at least a 50% deposit. Mr. Liverpool paid a downpayment of $4,620, with the balance to be paid when the item was delivered prior to Christmas. The sales receipt that was issued did not mark the item as a special order. Radcliffe's stated this was an "oversight."

The watch that was ordered is characterized as a "limited edition watch." Radcliffe's placed a special order for the watch, which included Mr. Liverpool's particular specifications, and checked with the manufacturer to see if it would be available, since it was a limited piece. The order was placed by Radcliffe's in late October, and Radcliffe's was billed for the item. When it was delivered, Radcliffe's attempted on numerous occasions to page Mr. Liverpool, but received no response. According to Mr. Liverpool's

---

6. Throughout the trial court testimony, Petitioner and Respondent refer to the brand name of the watch as "Philippe Charriol." In fact, according to the manufacturer/supplier's invoice, the brand name is "Philippe Carriol®."

testimony, when the watch was not available by Christmas, it slipped his mind until he returned to the store the following year.

The testimony was disputed as to what occurred thereafter, but specific findings on what then occurred are of no real consequence to the legal analysis.[7]  At some point, Mr. Liverpool demanded his money back, and the store refused. The watch was ultimately sold for $5,250 which constitutes a loss of profit on the original transaction with Mr. Liverpool of $1,750.

At trial, Mr. Liverpool contended that Radcliffe's violated the provisions of Maryland's Layaway Sales Act, Md. Commercial Law ("CL"), § 14–1101, *et seq.*, and accordingly sought treble damages on his initial downpayment of $4,620, together with attorney's fees in the amount of $4,500.  [The District Court judge] ultimately found that the sale constituted a bona fide C.O.D. transaction, and therefore was not governed by the Layaway Sales Act. Accordingly, [she] determined that Mr. Liverpool was entitled to a return of his deposit of $4,620, less the $1,750 in lost profit, and entered judgment in the amount of $2,870.

### Analysis

As we recently stated in *Insurance Co. of North America v. Miller,* 362 Md. 361, 372, 765 A.2d 587, 593 (2001),

---

7.  As noted *supra* note 3, there is no transcript of the District Court judge's oral ruling.  This explains why the Circuit Court judge considering the appeal did not present the trial judge's findings as to the disputed facts relative to the events that transpired when Petitioner returned to Respondent's jewelry store in November 1999, more than one year after the sales transaction, seeking a refund of his down payment.  Petitioner testified that he was told by Respondent's store clerk that he was unable to obtain a "refund because [the watch] was a special order."  According to Petitioner's testimony, he then offered to complete the transaction, but was told that the watch was not in the store.  Petitioner's version of events was disputed by Respondent's sales clerk who testified that the watch, in fact, was available and, when Petitioner was told he could complete the transaction, Petitioner refused and requested a refund.  The record indicates that the watch was ultimately sold by Radcliffe's to a disinterested third party for $5,250 in February 2000.

In an action tried without a jury, an appellate court 'will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.' Md. Rule 8–131(c). However, '[t]he clearly erroneous standard for appellate review in [Md. Rule 8–131] section (c) . . . does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact.' *Heat & Power Corp. v. Air Prods. & Chem. Inc.*, 320 Md. 584, 591, 578 A.2d 1202, 1205 (1990). In the present case, there are no genuine disputes as to the material facts. As the issue is solely a question of statutory construction and, thus, a question of law, we review the matter *de novo. See Total Audio–Visual Sys., Inc. v. Dep't of Labor, Licensing and Regulation,* 360 Md. 387, 394, 758 A.2d 124, 128 (2000); *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 575, 709 A.2d 749, 756 (1998); *Lacy v. Arvin,* 140 Md. App. 412, 421, 780 A.2d 1180, 1185–86 (2001).

Petitioner contends his purchase of the watch was a "special order transaction," and that "the Layaway Sales Act [applies] if the sale is either a . . . layaway agreement or a special order transaction" as defined by the Act. *See* §§ 14–1101(g)(1) & (2), 14–1101(k). Petitioner further asserts that the C.O.D. exclusion does not apply under the circumstances, arguing that the Act "explicitly dictates that a transaction cannot be both a 'special order transaction' and a 'C.O.D. transaction' " simultaneously. Accordingly, Petitioner asserts "the trial court and Circuit Court erred in finding that [Petitioner's] transaction with [Respondent] was not subject to the Maryland Layaway Sales Act."

Respondent does not dispute the characterization of the sale as a special order transaction, nor is it disputed that a special order transaction is within the scope of the Act. The real controversy, Respondent explains, is whether a special order transaction is subject to the C.O.D. exclusion. Respondent argues that the Legislature's placement of the C.O.D. exclusion immediately following the definition of layaway agree-

ment in § 14–1101(g)(1), as enlarged to include special order transactions in subsection (g)(2), made it "clear that the General Assembly intended the C.O.D. exclusion to apply to a '[s]pecial order transaction.' " Accordingly, Respondent asserts this sales transaction was "an excluded C.O.D. transaction."

## I.

The Maryland Layaway Sales Act, presently codified at Md.Code (1978, 2000 Repl.Vol.), Commercial Law Art., §§ 14–1101–14–1110, was enacted initially in 1978. *See* Chapter 673 of the Acts of 1978. The stated purpose of the Act is to "regulat[e] layaway sales[ ][and] requir[e] certain disclosure[ ][and] rights of cancellation and refund." The statute establishes procedures to be followed by a seller and a buyer who enter into a layaway agreement and provides for their respective remedies in case of default.

Section 14–1101 contains definitions of ten basic terms used in the Act. Among them, a "layaway agreement" is defined in § 14–1101(g) as follows:

*Layaway agreement.*—(1) "Layaway agreement" means a contract for the retail sale of consumer goods,[8] negotiated or entered into in the State, under which:

(i) Part or all of the layaway price[9] is payable in one or more payments subsequent to the making of the layaway agreement; and

---

**8.** "Consumer goods" is defined in § 14–1101(e) as "goods bought for use primarily for personal, family, or household purposes, as distinguished from industrial, commercial, or agricultural purposes." Petitioner testified that he purchased the watch as a Christmas gift for his wife, thereby qualifying the watch as consumer goods.

**9.** "Layaway price" is defined in § 14–1101(h) as "the cash price of consumer goods together with an optional service charge, not to exceed $1 if the price of the consumer goods is $500 or less or $5 if the price of the consumer goods exceeds $500."

(ii) The consumer goods are specific existing consumer goods identified from the seller's stock or inventory at the time of the making of the layaway agreement; and

(iii) The seller retains possession of the consumer goods and bears the risk of their loss or damage until the layaway price is paid in full.

*(2) "Layaway agreement" includes a "special order transaction," as defined in this section.*

*(3) "Layaway agreement" does not include a bona fide C.O.D. transaction.*

(4) "Layaway agreement" does not include any form of layaway agreement where the buyer can default without any penalty, other than a maximum service charge of $1.

(Emphasis added).

As indicated above, subsection (g)(3) expressly excludes from the definition of layaway agreement a "bona fide C.O.D. transaction," which is further defined in § 14–1101(d) as follows:

*C.O.D. transaction.*—"C.O.D. transaction" means an agreement by which the seller requires the buyer to pay the full cash price of the consumer goods upon delivery or tender of delivery by the seller, less any down payment[10] made by the buyer. A C.O.D. transaction does not include an agreement by which the seller requires the buyer to pay interim payments before delivery or tender of delivery of the consumer goods by the seller.

Subsection (g)(2) provides that a layaway agreement "includes a 'special order transaction,'" which is separately defined in § 14–1101(k) as follows:

*Special order transaction.*—"Special order transaction" means a contract for the retail sale of consumer goods, negotiated or entered into in the State, under which either:

---

**10.** Section 14–1101(f) defines down payment as "all amounts paid in cash, credits, or the agreed value of goods, by or for a buyer and to or for the benefit of the seller at or before execution of a layaway agreement or C.O.D. transaction."

(1) Consumer goods:

(i) Are ordered by the buyer to the buyer's unique specifications;

(ii) Are not carried by the seller, either in the seller's showroom or warehouse;

(iii) Are ordered from a manufacturer or supplier; and

(iv) Are not resalable by the seller at the sale price negotiated with the buyer; or

(2) Consumer goods which have been altered at the request of the buyer so that the goods are no longer salable to the general public.

In accordance with the Act, a sales transaction that qualifies as a layaway agreement must be in writing, signed by the parties,[11] and contain certain disclosures relative to the terms of the agreement.[12]   Moreover, the Act establishes certain

---

**11.** Section 14–1102 provides that a "layaway agreement shall be in writing and contain all of the agreements of the parties and shall be signed by all of the parties to it."

**12.** Section 14–1103 concerns the contents of the written agreement, and provides:

(a) A layaway agreement shall include:

(1) The full name, place of residence, and post office address of each party to it;

(2) The date when signed by the buyer;

(3) A clear description of the consumer goods sold sufficient to identify them readily;

(4) The cash price of the consumer goods sold;

(5) All charges for delivery, installation, or repair of or other services to the consumer goods which, separate from the cash price, are included in the layaway agreement;

(6) The sum of the cash price in paragraph (4) and the charges for services in paragraph (5);

(7) The amount of the buyer's down payment, together with:

(i) A statement of the respective amounts credited for cash, credits, and the agreed value of any goods traded in; and

(ii) A description of all goods traded sufficient to identify them;

(8) The unpaid balance of the cash price payable by the buyer to the seller which is paragraph (6) less paragraph (7);

(9) The service charge;

(10) The total of payments owed by the buyer to the seller, which is the sum of paragraphs (8) and (9), the number of installment payments required to pay it, and the amount and time of each payment;

obligations of the seller in a layaway sales transaction,[13] and

(11) The layaway price, which is the sum of paragraphs (6) and (9); and

(12) A clear and concise statement of all consequences of buyer's default.

(b) Paragraphs (4) through (12) of this section do not apply to any layaway sale subject to the disclosure provisions of the federal Truth in Lending Act if the seller complies with the applicable disclosure provisions of the federal act and its regulation.

13. Section 14–1104 concerns the duties of a seller in a layaway sales transaction, and provides:

(a) *Signed copy of agreement to buyer.*—At or before the time the buyer signs a layaway agreement, the seller shall give him an exact copy signed by the seller.

(b) *Consumer goods to be held for buyer.*—Upon execution of a layaway agreement, the seller shall hold for the buyer or agree to deliver to the buyer on a date mutually acceptable to both parties, the consumer goods or consumer goods that are identical to those originally selected by the buyer, as long as the buyer complies with all of the terms of the layaway agreement.

(c) *Cancellation of agreement.*—(1) The seller shall permit the buyer to cancel a layaway agreement, without any penalty or obligation, within 7 calendar days from the date of the layaway agreement.

(2) If the buyer cancels the layaway agreement as provided in paragraph (1) of this subsection, the seller shall:

(i) Refund all payments made under the layaway agreement; and

(ii) Return, in substantially as good condition as when received by the seller, any goods or property traded in.

(d) *Receipt; statement of account.*—(1) If a payment is made on account of a layaway agreement, the seller shall give the buyer on his request, or, if payment is made in cash, without request, a complete written receipt for the payment; and

(2) If the buyer requests information on the status of his account, the seller, within 10 days after the request at the place of business where the layaway sale was made, shall give the buyer a written statement setting forth:

(i) The layaway price;

(ii) The total amount paid by the buyer to date; and

(iii) The total amount remaining due to the seller.

(e) *Delivery of goods.*—After the buyer has made all payments to the seller in accordance with the layaway agreement, the seller shall deliver to the buyer the consumer goods or consumer goods that are identical to those originally selected by the buyer.

Moreover, § 14–1105 concerns the seller's obligations concerning the price of the consumer goods:

(a) The seller may not increase the layaway price of the consumer goods sold under a layaway agreement.

(b) If, within 10 calendar days after the execution of a layaway agreement, the seller reduces the selling price of existing items in his

provides the seller remedies in case of buyer default.[14]  In the event a seller fails to comply with §§ 14–1102, 14–1103, or 14–1104, the buyer is provided remedies in accordance with § 14–1109, which provides:

> (a) *Remedies of buyer.*—If the seller fails to comply with §§ 14–1102, 14–1103, or 14–1104, the buyer, before delivery by the seller and acceptance by the buyer of consumer goods purchased under a layaway agreement, may cancel the layaway agreement and receive from the seller a refund of all payments made under the layaway agreement and the return of any goods or property traded in.

---

stock or inventory identical to those being held for a buyer, the seller shall credit the buyer for the difference between the original layaway price and the reduced price.

**14.**  Section 14–1106 concerns buyer default and right of cancellation, and states:

(a) *When buyer is in default.*—The buyer is in default under a layaway agreement whenever 15 days has lapsed from the scheduled date on which the buyer failed to make a required payment.

(b) *Remedies of seller upon default.*—If the buyer defaults under paragraph (a) of this section, the seller may immediately cancel the layaway agreement and recover from the buyer liquidated damages under paragraph (c) of this section or § 14–1107, as applicable.

(c) *Liquidated damages upon default.*—If the buyer defaults under a layaway agreement 8 or more calendar days after the date of its execution, the seller may retain as liquidated damages an amount not to exceed 10 percent of the layaway price or the total amount paid by the buyer to the date of default, which ever is less.

(d) *Same–Default under special order transaction.*—Unless otherwise provided in the layaway agreement, paragraph (c) of this section does not apply if the buyer defaults under a special order transaction.

(e) *Cancellation before delivery or default.*—Except as provided in § 14–1104(c), at any time before delivery or tender of delivery, and before default by the buyer, the layaway agreement may be cancelled by the buyer.  However, the seller may retain from the refund due the buyer liquidated damages in an amount which is the lesser of 10 percent of the layaway price or the total amount paid by the buyer to the date of cancellation.

Section 14–1107 concerns rights and remedies of a seller upon buyer's default under a special order transaction, and provides:

If the buyer defaults under a special order transaction, the seller may exercise all rights and remedies available at either law or equity, including those rights and remedies as provided in the Uniform Commercial Code, Title 2 "Sales," Subtitle 7 "Remedies," of the Commercial Law Article.

(b) *Penalty.*—Any seller who makes a layaway sale in violation of this subtitle is liable to the buyer for a penalty amount equal to three times the amount paid by the buyer under the layaway agreement, plus reasonable attorney's fees. Any seller who demonstrates that a violation was nonwillful is not liable for the penalty or attorney's fees. The penalty provided in this subsection is in addition to that provided in subsection (a) of this section.

(c) *Proceeding under Title 13.*—If the Division of Consumer Protection, Office of the Attorney General has reason to believe that any seller has violated any provision of this subtitle, the Division may institute a proceeding under Title 13 of this article.

In the instant case, Petitioner seeks to invoke the Act's remedial provisions, seeking treble damages in the amount of $13,860, together with attorney fees in the amount of $4,500.[15]

## II.

■ We note that "[t]he goal with which we approach the interpretation of a statute . . . is to determine the intention of the Legislature enacting it." *County Council v. Dutcher,* 365 Md. 399, 416, 780 A.2d 1137, 1147 (2001). In *Mayor of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000), we instructed:

Of course, the cardinal rule is to ascertain and effectuate legislative intent. To this end, we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also.

Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect

---

15. Petitioner's complaint in the District Court sought relief only under § 14–1109(b), and did not include apparently a refund of his down payment made at the time of the sales transaction, in the amount of $4,620, as separately provided for in § 14–1109(a). *See* § 14–1109(b) (explaining that the penalty provided is *"in addition* to" that provided in § 14–1109(a) (emphasis added)).

an intent not evidenced in that language,' nor may it construe the statute with " 'forced or subtle interpretations' that limit or extend its application." Moreover, whenever possible, a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory.

(quoting *Chesapeake and Potomac Tel. Co. of Md. v. Dir. of Fin. for Mayor of Balt.,* 343 Md. 567, 578–79, 683 A.2d 512, 517–18 (1996) (internal citations omitted)).

We have acknowledged that, in ascertaining a statute's meaning, we must consider the context in which a statute appears. *See Chase,* 360 Md. at 129, 756 A.2d at 991–92; *Morris v. Prince George's County,* 319 Md. 597, 604, 573 A.2d 1346, 1349 (1990); *State v. 149 Slot Mach.,* 310 Md. 356, 361, 529 A.2d 817, 819 (1987). In this regard we have instructed:

When the statute to be interpreted is part of a statutory scheme, it must be interpreted in that context. That means that, when interpreting any statute, the statute as a whole must be construed, interpreting each provision of the statute in the context of the entire statutory scheme. Thus, statutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory.

*Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 302–03, 783 A.2d 667, 671 (2001) (internal quotations omitted) (citations omitted).

■ On the other hand, "where the meaning of the plain language of the statute, or the language itself, is unclear, 'we seek to discern legislative intent from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.' " *Webster v. State,* 359 Md. 465, 480, 754 A.2d 1004, 1012 (2000) (quoting *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998)). *See also Whiting–Turner,* 366 Md. at 302, 783 A.2d at 670–71 ("Only if the words of the statute are ambiguous need we seek the Legislature's intent in the legislative history or

other extraneous sources."). We recently explained the rules applicable when the terms of a statute are ambiguous:

'When the words of a statutory provision are reasonably capable of more than one meaning, and we examine the circumstances surrounding the enactment of a legislative provision in an effort to discern legislative intent, we interpret the meaning and effect of the language in light of the objectives and purposes of the provision enacted. Such an interpretation must be reasonable and consonant with logic and common sense. In addition, we seek to avoid construing a statute in a manner that leads to an illogical or untenable outcome.

*Webster*, 359 Md. at 480, 754 A.2d at 1012 (quoting *Lewis v. State*, 348 Md. 648, 654, 705 A.2d 1128, 1131 (1998) (internal citations omitted)). We defined the term "ambiguity" as "reasonably capable of more than one meaning," *see Webster*, 359 Md. at 480–81, 754 A.2d at 1012 (citation omitted), and further explained that:

'language can be regarded as ambiguous in two different respects: 1) it may be intrinsically unclear ...; or 2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain.' Thus, a term which is unambiguous in one context may be ambiguous in another.

*Webster*, 359 Md. at 481, 754 A.2d at 1012 (citations omitted).

### III.

That the sales transaction in the present case was a special order purchase is not disputed by the parties.[16] Moreover,

---

16. Initially, Petitioner took the position that the purchase of the watch was *not* a special order transaction, but rather a layaway sales transaction. Notably, in opening argument at trial, Petitioner's counsel stated, "[t]he Plaintiff will prove that [the watch] was not a special order and was in fact a layaway agreement, and that Defendant has violated the *Layaway Sales Agreement Act* in several different respects...." Moreover, Petitioner's counsel entered into evidence Petitioner's sales receipt on which a box, indicating the sales transaction was a "special order," was not marked, and then objected to testimony to the contrary

while there is no record transcript of the trial judge's oral ruling or reasoning, *see supra* note 3, the Circuit Court judge found that the trial judge "concluded ... that [the watch] was a special order item" and that this conclusion was supported by the record. We agree. Petitioner's purchase of the watch satisfies the requisite elements of a special order transaction: (1) Petitioner ordered a watch from Respondent based on his particular specifications; [17] (2) the watch was not available in Respondent's showroom or warehouse; [18] (3) the watch was ordered directly from the manufacturer/supplier; [19] and finally, (4) Respondent was unable to sell the watch at the price originally negotiated with Petitioner, ultimately selling the watch, at a loss, more than one year later in an arms-length transaction.[20] *See* § 14–1101(k)(1)(i)–(iv).

---

on the grounds that its was "parol evidence that contradict[ed] the written agreement." Reversing his initial position, however, in closing argument Petitioner's counsel argued, "[t]he Layaway Sales Agreement Act includes special orders, and because of that my client is entitled to judgment."

**17.** Petitioner's sales receipt, dated 22 October 1998, indicates Petitioner purchased from Respondent a Philippe Carriol® watch with the following specifications: "052–81–423[,] 18 K solid gold[,] dial: white/black[,] Roman figure[,] ivory centre[,] movement Quartz[,] 18 K gold cable band[,] Bezel diamond .20 ct[,] size small." Further, Respondent's sales clerk testified that this was a "special limited edition [watch]," and that "when [she] order[ed] the particular watch, ... there's a list of things that ... make this watch specific, so [she had] to write each one of them and that's why on the receipt, everything is ... listed."

**18.** Petitioner and Respondent's sales clerk testified that the watch Petitioner wanted was not available in Respondent's showroom. Petitioner was shown a catalog from which he made his selection.

**19.** Respondent's purchase order faxed to Philippe Carriol®, the company's corresponding confirmation dated 16 November 1998, and subsequent invoice dated 1 December 1998, provided support that the watch was ordered direct from the manufacturer/supplier. Further, Respondent's sales clerk testified that the watch was ordered directly from the manufacturer.

**20.** Respondent's sales clerk testified that the watch was ultimately sold as part of an after-Christmas clearance sale at a loss of $1,750. Respondent also produced a sales receipt representing the sale of the watch Petitioner ordered from Respondent in an arms-length transac-

■ The linchpin of Petitioner's claim is that the Act is applicable to special order transactions. Recognizing, however, a patent incongruity between the requisite elements to create a layaway agreement as provided in subsection (g)(1), and those creating a special order transaction enumerated in § 14–1101(k)(1)(i)–(iv), Petitioner contends that the Legislature's placement of "special order transaction" in the inclusion portion of the definition of "layaway agreement" was meant to enlarge the definition of layaway agreement, and not merely as an illustration, thus providing "an *alternative* means to invoke the protection of the Layaway Sales Act." (Emphasis added). *See* subsection (g)(2). In this vein, Petitioner argues the Circuit Court erred by imposing upon Petitioner the impossible task of proving "the elements of both a 'special order transaction' and a 'layaway agreement' " simultaneously.

Petitioner correctly points out that the definitions of "layaway agreement" and "special order transaction" are incompatible.[21] On the one hand, to qualify as a layaway agreement, a sales transaction must be for consumer goods that are "identified from the seller's stock or inventory at the time of the making of the layaway agreement." § 14–1101(g)(1)(ii). In contrast, a "special order transaction" requires the sales transaction to be for consumer goods "not carried by the seller, either in the seller's showroom or warehouse," and "ordered from a manufacturer or supplier." § 14–1101(k)(1)(ii), (iii). Accordingly, while the Legislature's use of the term "includes" in subsection (g)(2) may appear to introduce "special order transaction" as an illustration of a "layaway agreement," the

tion. The sales receipt details the sale of a Philippe Carriol® eighteen karat gold watch to Walter Wilson on 1 February 2000 in the amount of $5,250, plus tax.

21. The Circuit Court judge observed that "there may be some peculiar circumstances under which a special order transaction also qualifies as a layaway agreement...." She neglected, however, to describe any examples she might have in mind or even the methodology or factors by which such an analysis might be undertaken. Given the mutual exclusivity of the respective terms of "layaway agreement" and "special order transaction," we are unable to contemplate any articulable circumstance under which that might occur.

mutual exclusivity of the respective elements when read in conjunction with each other, introduces an element of ambiguity that requires judicial interpretation of the term "includes" as it is used in subsection (g)(2).[22]

Admittedly, the term "includes," by itself, is not free from ambiguity. *See Housing Auth. of Balt. City v. Bennett,* 359 Md. 356, 371, 754 A.2d 367, 375 (2000) (recognizing that the term "including" is "somewhat ambiguous"). "Includes" has various shades of meaning, and its interpretation "depends upon the context" in which the term is used. *Bennett,* 359 Md. at 372, 754 A.2d at 375–76. We have said that " '[o]rdinarily, the word 'include[s]' means comprising by illustration [of a general term] and not by way of limitation.' " *State v. Wiegmann,* 350 Md. 585, 593, 714 A.2d 841, 845 (1998) (quoting *Group Health Ass'n v. Blumenthal,* 295 Md. 104, 111, 453 A.2d 1198, 1203 (1983)). *See* Md.Code (1957, 2001 Repl.Vol.), Art. 1, "Rules of Interpretation," § 30 ("The words 'includes' or 'including' mean, unless the context requires otherwise, includes or including by way of illustration and not be way of limitation."). We have also stated the term "includes" may "signal an expansion in meaning of previous language," *see Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 396, 488 A.2d 486, 492 (1985), and may be interpreted to mean "and" or "in addition to." *See Pacific Indem.,* 302 Md. at 397, 488 A.2d at 493 (citing Black's Law Dictionary 687 (5th ed.1979) (defining "include" as a term that may, "according to context, express an enlargement and have the meaning of *and* or *in addition to* ")). *See also Lowry v. City of Mankato,* 231 Minn. 108, 42 N.W.2d 553, 559 (1950) (explaining "includes" is sometimes used "to add to a class a genus not naturally belonging thereto, and also in an accumulative sense and as classing that which follows with that which has already been mentioned"); 2A N. Singer, Sutherland on Statutes and Statutory Construction, § 47.07, at 152 (5th ed.1992) (noting

---

**22.** "What we've got here is a failure to communicate." *Cool Hand Luke* (Warner Brothers 1967), (Strother Martin as "Captain" to Paul Newman as "Luke.")

"[i]t has been said 'the word 'includes' is usually a term of enlargement, and not of limitation. . . . It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated . . . . ' ") (citations omitted)). It has also been construed as a word of limitation or restriction. *See Bennett,* 359 Md. at 372, 754 A.2d at 375 (acknowledging that "sometimes [the words 'including' or 'includes'] are not words of illustration or enlargement") (citing *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 125, 55 S.Ct. 60, 61, 79 L.Ed. 232 (1934) ("It may be admitted that the term 'includes' may sometimes be taken as synonymous with 'means.' ")); *Frame v. Nehls,* 452 Mich. 171, 550 N.W.2d 739, 742 (1996) ("When used in the text of a statute, the word 'includes' can be used as a term of enlargement or of limitation, and the word in and of itself is not determinative of how it is intended to be used.").

■ We agree with Petitioner that, in the present context, the term "includes" manifests a legislative intent to extend application of the Act to encompass special order transactions in addition to layaway agreements as initially defined in subsection (g)(1). In reaching this conclusion we are mindful that "words in a statute must be interpreted in the context of a statute as a whole." *Bennett,* 359 Md. at 372–73, 754 A.2d at 376. Section 14–1106(b) provides a seller with the option to cancel a layaway agreement if a buyer is more than fifteen days late in making a scheduled payment, *see* § 14–1106(a) at *supra* note 14, and to recover liquidated damages under one of two schemes: (1) if a buyer defaults under a layaway agreement eight or more calendar days after the date of its execution, a seller may "retain . . . an amount not to exceed 10 percent of the layaway price or the total amount paid by the buyer to the date of default, whichever is less," *see* § 14–1106(c) *supra* note 14; or (2) if a buyer defaults under a special order transaction, the seller may "exercise all rights and remedies available at either law or equity, including those rights and remedies as provided in the Uniform Commercial Code, Title 2 "Sales," Subtitle 7 "Remedies," of the Commercial Law Article," *see* § 14–1107 *supra* note 14. The legislature's inclusion of two distinct remedies dependent on whether

a special order transaction is involved is a clear indication of its intent to provide parallel protection for both a layaway agreement within the meaning of subsection (g)(1) and special order transactions as defined in § 14–1101(k).

Moreover, such a construction is consonant with the legislative history of the Act. Several years prior to the enactment of the Layaway Sales Act, the Consumer Protection Division ("Division") of the Maryland Office of the Attorney General, in accordance with its rule-making powers,[23] promulgated proposed regulations governing layaway sales transactions under the Code of Maryland Regulations ("COMAR") former 02.01.04 Lay–Away Agreements. *See* 2:29 Md. R. 1743–44 (Dec. 24, 1975). The Division's action was prompted by its findings that layaway agreements were "handled inconsistently" and "arbitrarily structured," and that layaway sellers provided inadequate "documentation and disclosure of the rights and obligations of the merchant and consumer . . . all to the detriment of the consumer." COMAR former 02.01.04.02, Findings. *See also* 2:29 Md. R. at 1743. The proposed regulations, *inter alia*, defined the term "lay away"[24] and proscribed certain conduct as "unfair or deceptive trade practices" and a violation within § 13–301 of Maryland's Consumer Protection Act ("CPA"), Md.Code (1975), Commercial Law Art., § 13–101 *et seq. See* 2:29 Md. R. at 1743–44. *See also* COMAR former 02.01.04.04, Unfair or Deceptive Trade Practices. Of particular relevance here, it became an unfair or deceptive trade practice for a layaway seller to "fail to com-

---

**23.** *See* Chapter 609 of the Acts of 1974. *See also* Maryland's Consumer Protection Act ("CPA"), Md.Code (1975), Commercial Law Art., § 13–205 (concerning the rule-making powers of the Consumer Protection Division). The CPA is presently codified at Md.Code (1975, 2000 Repl.Vol., 2001 Supp.) Commercial Law Art., § 13–101 *et seq.*

**24.** COMAR former 02.01.04.03B., the definition section, defined the term "lay away" in pertinent part as:

[A]n agreement whereby the consumer agrees to purchase consumer goods identified to the transaction at the time of the agreement by means of a down payment and subsequent payment or payments, with the merchant retaining possession of the goods until the agreed payments are completed.

ply" with § 12–615, the cancellation and refund provision of Maryland's Retail Installment Sales Act ("RISA"), Md.Code (1975), Commercial Law Art., § 12–601 *et seq.* *See* COMAR former 02.01.04.04F. *See also* 2:29 Md. R. at 1744. Section 12–615(a), as it pertained to layaway agreements, gave a buyer the option to cancel a layaway agreement "before delivery or tender of the goods by the seller," *see* subsection (a)(1), and essentially limited a seller's liquidated damages in such cases to a maximum of ten percent of all payments made by the buyer, including any down payment.[25] *See* subsection (a)(2). *See also State v. Action TV Rentals,* 297 Md. 531, 552, 467 A.2d 1000, 1011 (1983) (noting "it became a CPA unfair trade practice for a layaway seller, who treated the buyer's failure to pay the selling price as a breach of contract, to claim damages in excess of 10% of the payments made"). The proposed regulations were subsequently adopted, without change. *See* 3:13 Md. R. 720 (June 23, 1976). Notably, the Statement for Reasons of Adoption accompanying that section advised that the original draft of the proposed regulation had been modified to avoid "language which might have brought special orders within the definition of 'layaway,'" an aspect which "merchants had generally considered onerous." *Id.*

Less than one year later, and in apparent response to merchant concern that a layaway seller was not sufficiently protected in case of buyer default in special order transactions under the remedy provided in subsection .04F., the Division adopted a new regulation exempting special order transactions

---

**25.** Section 12–615 stated in pertinent part:

(a) *Buyer's right to cancel; refund.*—(1) If, in addition to any down payment, a buyer is required under an installment sale agreement to make a payment to a seller before the seller is obligated to deliver the goods sold, the buyer may cancel the installment sale agreement before delivery or tender of the goods by the seller.

(2) Notwithstanding any provision of the installment sale agreement, if it is cancelled pursuant to this subsection, the seller shall refund to the buyer within ten days after notice of the cancellation an amount equal to at least 90 percent of all payments made by the buyer under the installment sale agreement, including any down payment.

from regulation.[26]  *See* COMAR former 02.01.04.06, Exemption.  *See also* 4:16 Md. R. 1206, Statement of Reasons for Adoption of Amendment to Lay–Away Regulation (Aug. 3, 1977) (exempting "certain specific areas where the merchant has changed position to his detriment and [wa]s unable to resell specially ordered goods at the price negotiated between the merchant and the consumer at the time the order was placed").

The following year, in light of the enactment of the Layaway Sales Act, COMAR former 02.01.04 Lay-away Agreements was repealed.  *See* 5:16 Md. R. 1253 (August 11, 1978). Moreover, "layaway agreement" as defined by § 14–1101(g) was expressly excluded from the definition of "installment sale agreement" as defined in RISA. *See* Chapter 673, § 1 of the Acts of 1978. *See also* Md.Code (1975, 1978 Supp.), Commercial Law Art., § 12–601; Md.Code (1975, 1978 Supp.), Commercial Law Art., § 14–1108 (noting that RISA "does not apply to any sale of consumer goods regulated by [Title 14, Subtitle 11]").

A comparison of the Act's relevant provisions with the layaway regulations in effect prior to its enactment, presents a

---

**26.**  While not explicitly identifying the exempt transactions as "special order transactions," the description was substantively identical to the current definition of special order transaction within the meaning of § 14–1101(k). The provision exempting special order transactions from regulation under COMAR former 02.01.04.06 stated:

   A.  For the purpose of this regulation, lay-away agreements may not include goods which:

   (1) Are ordered by the consumer to the consumer's unique specifications; and

   (2) Are not carried by the merchant, either in the merchant's showroom or warehouse; and

   (3) Must be ordered from a manufacturer or supplier; and

   (4) Are not resalable by the merchant at the sale price negotiated with the consumer.

   B.  For the purpose of this regulation, lay-away agreements may not include goods which are specially altered at the request of the customer so that the goods are no longer saleable to the general public, provided, however, this exemption shall apply only after these goods have, in fact, been altered.  (Examples: Silverware engraved with customer's initials, clothing altered to customer's specifications.)

strong correlation between the respective treatment of special order transactions and the remedies available to a layaway seller in case of buyer default. It is clear that the legislature intended to address the merchant concern of an inadequate seller's remedy in special order transactions by its introduction of § 14–1107, which allows a seller the right to exercise "all rights and remedies available" under the U.C.C., including, as here, the right to recover the difference between the resale price and the contract price of the goods, together with incidental damages. *See, e.g.,* § 2–706. This distinct and heightened remedy effectively eliminated the need to exclude special order transactions under the scope of the Act, while extending the obligations and remedies provided under the Act under such circumstances.

Moreover, our construction is commensurate with the statutory scheme under the CPA,[27] Md.Code (1975, 1990 Repl.Vol., 1998 Supp.), Commercial Law Art., §§ 13–101 *et. seq. See* § 13–102 (recognizing the "mounting concern over the increase of deceptive practices in connection with sales of merchandise," *see* § 13–102(a), the General Assembly declared its intention to "set certain minimum statewide standards for the protection of consumers across the State." *See* § 13–102(b)). *See also CitaraManis v. Hallowell,* 328 Md. 142, 150, 613 A.2d 964, 968 (1992) (explaining that the Legislature's goal in enacting the CPA was to "provide protection against unfair or deceptive practices in consumer transactions" by "implement[ing] strong protective and preventative measures to assist the public in obtaining relief from unlawful consumer practices and to maintain the health and welfare of the citizens of the State") (citing § 13–102(b)(3)). We can think of no reason that a consumer in a special order transaction should be afforded any less protection than a consumer in a layaway sales transaction.

---

27. The CPA prohibits a person from engaging in "any unfair or deceptive trade practice" in connection with the "sale ... of any consumer goods." § 13–303(1). Violation of the Layaway Sales Act is deemed an "unfair or deceptive trade practice" and a CPA violation. *See* § 13–301(14)(viii). *See also* § 14–1109(c) at *supra* pages 12–13.

The common thread in both sales transactions is the potential imposition of a penalty in case of buyer default. As previously indicated, a seller's liquidated damages upon buyer default in a layaway sales transaction, as defined in subsection (g)(1), is limited to "10 percent of the layaway price or the total amount paid by the buyer to the date of default, whichever is less." § 14–1106(c). On the other hand, a seller's liquidated damages upon buyer default in a special order transaction, as defined in § 14–1101(k), includes "all rights and remedies" under the U.C.C., which conceivably could expose a special order purchaser to considerably greater liability than under § 14–1106(c). § 14–1107. Certainly, the need for "[a] clear and concise statement of all consequences of buyer's default" is, if arguably not greater, at least equally as important in a special order transaction as it is in a layaway sales transaction. § 14–1103(12). Communication to consumers of potential penalties in case of buyer default in a special order transaction is in keeping with the objectives of the CPA. In light of the statute's text, legislative history, and the Act's role within the statutory scheme of the CPA, we conclude that the most reasonable reading of subsection (g)(2) is to infer a legislative intent to extend application of the Act to encompass special order transactions.

## IV.

We turn now to consider whether the special order transaction in the instant case was properly excluded in accordance with § 14–1101(g)(3), which provides that a " '[l]ayaway agreement' does not include a bona fide C.O.D. transaction." Our inquiry is twofold: first, we must determine whether Petitioner's special order purchase of the watch constituted a "bona fide C.O.D. transaction" within the meaning of § 14–1101(d); if the answer is yes, we must then determine whether a special order transaction can also constitute a C.O.D. transaction. In accord with well-established principles of statutory construction, "[w]here the statute to be construed is a part of a statutory scheme, the legislative intention is not determined from that statute alone, rather it is to be dis-

cerned by considering it in light of the statutory scheme." *Chase,* 360 Md. at 129, 756 A.2d at 992 (internal quotations omitted) (citation omitted). Accordingly, our inquiry requires a review of the appropriate U.C.C. provisions as well as the Act.

Petitioner argues that a "special order transaction" and "a bona fide C.O.D. transaction" are mutually exclusive concepts, and proof that his watch purchase was a special order transaction is dispositive that the sale was not a C.O.D. transaction subject to exclusion. Respondent, on the other hand, asserts that it is "undisputed that this was a bona fide C.O.D. transaction," arguing that by "Petitioner's own evidence, the parties agreed that.[Petitioner] would make a down payment with the balance due upon delivery of the watch." [28] The crux of this dispute, Respondent contends, is whether there is anything in the Act to prevent a special order transaction from also being an exempt C.O.D. transaction. "C.O.D.," however, was not an express term of the contract between the parties. Based on this, we conclude that Petitioner's purchase of the watch was not a "bona fide C.O.D. transaction" within the meaning of § 14–1101(d), and accordingly was not excluded by subsection (g)(3).

A common type of commercial sales transaction is a sale on "C.O.D.". The initials are an abbreviation of the words "collect on delivery" or "cash on delivery." *See* BIEBER'S DICTIONARY OF LEGAL ABBREVIATIONS 136 (5th ed.2001); BLACK'S LAW DICTIONARY 250 (7th ed.1999). Section 14–1101(d) defines a "C.O.D. transaction" as:

---

**28.** Respondent apparently refers to Petitioner's response to interrogatories relating to payment arrangements on the unpaid balance of the watch, which provided:

> [Answer]: [Petitioner] contracted to purchase a Phillipe Charriol watch from [Respondent] for seven thousand dollars. [Petitioner] made a down payment of four thousand, six hundred and twenty dollars.... [Petitioner] was to pay for the watch in full before taking possession, and that [Respondent] was to page [Petitioner] when the watch arrived at the store."

an agreement[29] by which the seller requires the buyer to pay the full cash price[30] of the consumer goods upon delivery or tender of delivery by the seller, less any down payment made by the buyer. A C.O.D. transaction does not include an agreement by which the seller requires the buyer to pay interim payments before delivery or tender of delivery of the consumer goods by the seller.

It is clear from a plain reading of subsection (d) that a C.O.D. transaction is established at the option of the layaway seller and by consent of the buyer. What is less obvious is that the term "C.O.D." or its equivalent, *see supra,* is a term of art that does not concern merely the simultaneous disposal of a seller's duty to tender delivery of the goods and a buyer's duty to pay for them. *See* § 2–301.[31] Rather, it also denotes a buyer's consent to forgo his right of inspection of the goods prior to

**29.** While the term "agreement" is not defined in the definitional section of the Act, § 1–201 of the U.C.C. provides the definitions of forty-six basic terms as a tool to interpret the many U.C.C. sections. "Agreement" is defined as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." § 1–201(3).

**30.** "Cash price" is defined in § 14–1101(c) as "the minimum price for which consumer goods subject to a layaway agreement, or other consumer goods of like kind and quality, may be purchased for cash from the seller by the buyer."

**31.** The basic obligations of the seller and a buyer are set forth in § 2–301, which provides that "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." *See also* § 2–507(1) ("Tender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay for them."); § 2–511 ("Unless otherwise agreed tender of payment is a condition to the seller's duty to tender and complete any delivery."). What is less obvious is the matter of who goes first? In this vein, the Official Comment to § 2–511 explains:

[u]nless there is agreement otherwise the concurrence of the conditions as to tender of payment and tender of delivery requires their performance at a single place or time.... The [various other sections of the U.C.C.] dealing with time and place of delivery together with the section on the right to inspection of goods [*see* § 2–513, *infra* ] answer the subsidiary question as to when payment may be demanded before inspection by the buyer.

payment, and must be an express term of the contract for sale after due negotiation. *See* § 2-513(3).

While the U.C.C. does not define expressly the term "C.O.D.," it provides that a delivery "C.O.D.," or like terms, implicitly creates limitations on a buyer's right to inspect goods. *See* § 2-513(3). Section 2-513 deals generally with a buyer's right of inspection and contract limitations upon that right, and provides in relevant part:

(1) Unless otherwise agreed and subject to subsection (3), where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect[32] them at any reasonable place and time and in any reasonable manner. When the seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival.

. . . .

(3) Unless otherwise agreed . . . the buyer is not entitled to inspect the goods before payment of the price when the contract provides

(a) For delivery "C.O.D." or on other like terms;

. . . .

The Official Comment to § 2-513 explains further:

The phrase "unless otherwise agreed" is intended principally to cover such situations as those outlined in subsections (3) and (4) and those in which the agreement of the parties negates inspection before tender of delivery.

. . . [W]here payment is due against delivery [a buyer] may, unless otherwise agreed, make his inspection before payment of the price.

§ 2-513, cmts. 1 & 2.

We gain further insight from additional sections in the U.C.C. that integrate the provisions of § 2-513. Section 2-

---

**32.** This inspection is merely to determine whether the goods conform to the contract, and is not to be regarded as a "condition precedent to the passing of title" or to be confused with the " 'examination' of the goods or of a sample or model of them at the time of contracting which may affect the warranties involved in the contract." § 2-513, cmts. 8 & 9.

310 addresses the time for payment of goods, and states that "[u]nless otherwise agreed ... [p]ayment is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery; ...." § 2–310(a). The Official Comment to § 2–310 notes that paragraph (a) "grants an opportunity for the exercise by the buyer of his preliminary right to inspection before paying." § 2–310, cmt. 1. Remarking on the right to inspect under § 2–513, it is noted that "if the seller wishes to demand payment before inspection, *he must put an appropriate term into the contract.*" § 2–310, cmt. 4 (emphasis added).

Section 2–512 concerns payment by a buyer before inspection. The Official Comment explains:

This section applies to cases in which the contract requires payment before inspection *either by the express agreement of the parties or by reason of the effect in law of that contract.* The present section must therefore be considered in conjunction with the provision on right to inspection of goods which sets forth the instances in which the buyer is not entitled to inspection before payment.

§ 2–512, cmt. 6 (emphasis added).

█ It is clear that under the U.C.C. a provision for delivery C.O.D., by the very nature of the transaction, deprives a buyer of an entitled right to inspect the goods before making payment. *See* § 2–513(3)(a). While a buyer may waive his or her right of inspection, *see* § 2–315(1), there must be some indicia of his or her consent to do so, either expressly or by agreeing to payment terms which are inconsistent with a right to inspect. *See* § 2–513(3)(a), (b). An agreement between the parties that payment by the buyer is a condition to receipt of the goods, merely reflects the common commercial practice that payment and delivery are concurrent conditions, *see supra* note 31, and it is not an adequate expression of a buyer's intent to waive his or her right to inspect the goods prior to payment.

Consideration of the legislative history concerning the C.O.D. exemption under prior layaway regulations lends sup-

port to this conclusion. Under COMAR former 02.01.04.03C., "bona fide C.O.D. transactions" were exempt from layaway regulation. The definitional section, stated in pertinent part:

> For the purpose of these regulations, bona fide C.O.D. transactions, exempt pursuant to [RISA] § 12–601(1)(3), Annotated Code of Maryland, are those contracts *designated* "C.O.D." or "collect on delivery", in which the consumer agrees to pay the full purchase price upon delivery or tender of delivery of the goods (delivery or tender of delivery of the goods being set at a date certain or upon the happening of a specific event such as a receipt from manufacturer or wholesaler), less any deposit paid upon the customer ordering the goods. Bona fide C.O.D. transactions will not include transactions where interim payments are accepted by the merchant before delivery or tender of delivery.

COMAR former 02.01.04.03C. (emphasis added). A plain meaning reading of the term "designated" indicates a regulatory intent that "C.O.D." was to be a specified term of the contract for sale. *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 343–44 (9th ed.1989) (defining "designate" in the following terms: "to indicate and set apart for a specific purpose ... [s]pecify, [s]tipulate ... [d]enote ... to call by a distinctive title, term, or expression").

Furthermore, there is nothing in the language of § 14–1101(d) defining C.O.D. which precludes it from being read in harmony with the inspection provision of § 2–513. *See Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 480, 784 A.2d 569, 577 (2001) (explaining that when two statutes in a statutory scheme "enacted at different times and not referring to each other, address the same subject, they must be read together, i.e., interpreted with reference to one another, and harmonized, to the extent possible, both with each other and with other provisions of the statutory scheme.") (internal quotations omitted) (citations omitted).

There is nothing in the record, oral or written, to support the supposition that Respondent designated the sales transaction in the instant case as "C.O.D." and that Petitioner agreed

to the condition. Nor do the surrounding circumstances implicate such an understanding between the parties.[33] Accordingly, we conclude that Petitioner's purchase of the watch was a special order transaction within the meaning of § 14–1101(k). Moreover, we conclude that special order transactions are subject to the obligations and remedies contemplated by the Act. *See* subsection (g)(2). In view of this Court's determination that this sale was not a C.O.D. transaction within the meaning of § 14–1101(d), we leave for another day the apparent conundrum presented by the interplay between the C.O.D. exclusion articulated in subsection (g)(3) as it applies to special order transactions as defined in § 14–1101(k).[34] Accordingly,

---

**33.** While not a condition of the term, "C.O.D." is frequently used in connection with a carrier delivering goods to a buyer at a location other than the seller's place of business, whereby the buyer has agreed to pay the full cash price on the amount due to the carrier, who then forwards the payment to the seller. *See* BLACK'S LAW DICTIONARY 250 (7th ed. 1999) ("By consenting to this delivery term, the buyer agrees to pay simultaneously with delivery and appoints the carrier as the buyer's agent to receive and transmit the payment to the seller."). Likewise, "C.O.D." is a trade term in contracts with carriers that instructs the carrier as to the method of delivery and payment. *See* 67 AM JUR. 2d *Sales* § 552 (1985) ("A common type of commercial transaction is a sale on a "c.o.d." basis.... [A]nd its use clearly has for an object an instruction to the carrier or transporter not to deliver the goods until the price therefor is collected."). That was not the circumstance here. The testimonial evidence indicates the mutual understanding of the parties that the Respondent would order the watch from the manufacturer, that the watch would be shipped directly to Respondent, and that Respondent would page Petitioner when it was available for pick-up at the store.

Another circumstance that might warrant delivery C.O.D. is where the seller wishes to protect himself from a buyer of doubtful credit by demanding cash on delivery. *See Cermetek, Inc. v. Butler Avpak, Inc.,* 573 F.2d 1370, 1379 (9th Cir.1978) ("The seller generally utilizes a C.O.D. contract because he either does not trust the buyer or does not intend to advance credit."). There is no indication here that Respondent demanded cash payment for the unpaid balance on the watch. To the contrary, Petitioner testified that "any form or fashion that I paid, I would receive the watch." Respondent did not dispute Petitioner's contention. Accordingly, we can discern nothing from the surrounding circumstances of the sale to implicate an understanding between the parties that this would be delivery "C.O.D.".

**34.** We recognize that a special order transaction within the meaning of § 14–1101(k) and a C.O.D. transaction within the meaning of § 14–

we reverse the judgment of the Circuit Court and remand the case to that court with instructions to reverse the judgment of the District Court and to remand the case to the District Court for a new trial consistent with this opinion.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY REVERSED, AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE DISTRICT COURT OF MARY-LAND, SITTING IN BALTIMORE COUNTY, AND TO RE-MAND THE CASE TO THE DISTRICT COURT FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE CIRCUIT COURT TO BE PAID BY RESPONDENT.*

---

1101(d) are not mutually exclusive by their definitions. While we do not decide whether the C.O.D. exclusion of subsection (g)(3) applies to a special order purchase, it begs the question as to why the method of delivery would dictate whether a buyer is entitled to threshold notice concerning the potential imposition of penalties where the buyer is in default.