866 A.2d 906

**Wendell HACKLEY**

v.

**STATE of Maryland.**

**No. 2953, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Jan. 28, 2005.

**4**

Allison E. Pierce (Stephen E. Harris, Public Defender, on brief), for appellant.

Annabelle L. Lisic (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel ADKINS, BARBERA, BISHOP, JOHN J., (Retired, specially assigned) JJ.

BARBERA, J.

Appellant, Wendell Hackley, was convicted by a jury in the Circuit Court for Prince George's County of second degree assault, reckless endangerment, and stalking.[1] The court merged the reckless endangerment conviction into the assault, and sentenced appellant on that conviction to ten years' incarceration, with all but two years suspended. The court sentenced appellant on the stalking conviction to a concurrent term of five years' incarceration, with all but two years suspended and five years of supervised probation.

Appellant's sole argument on appeal challenges the sufficiency of the evidence to sustain his stalking conviction. For the following reasons, we shall affirm the circuit court's judgment.

### FACTS

At the time of trial, Devora P. had known appellant for approximately thirteen years. The two dated for some time and have a child, Adriana, who was born in October, 1991. Eventually, Ms. P. and appellant stopped seeing each other, and did not come into contact for a number of years.

---

1. The court granted appellant's motion for judgment of acquittal on the charges of intimidating a witness and theft of property valued at less than $500. The jury acquitted appellant of first degree assault, use of a handgun in the commission of a felony or a crime of violence, and carrying a handgun.

Around 7:30 a.m., on November 17, 2001, Ms. P. was sitting in her car, preparing to leave for work. The car was parked in the driveway of her home. As she looked in the rear view mirror, she saw a man walking towards her. She recognized the man as appellant when he reached her car.

Ms. P. was surprised by appellant's presence. Appellant repeatedly asked Ms. P., "Where's my daughter?", to which she responded, "Adriana is not here. She is with my mother."

Ms. P. testified that appellant reached in his coat pocket and pulled out a gun. He then opened up the car door, pulled Ms. P. out of the car, and started hitting her on the head with the gun, cutting her. Ms. P. kicked appellant and screamed for her mother. Ms. P.'s mother called the Bladensburg Police Department, then went outside. After that, appellant let go of Ms. P. and left.

Officer Cowling responded to the scene and found Ms. P. with blood on her shirt and head. Ms. P.'s mother eventually drove Ms. P. to the hospital, where she received eight to nine stitches to her head.

Over the next month, appellant made contact with Ms. P. on four more occasions. The first occurred when Ms. P. found two letters, in appellant's handwriting, under her car's windshield wiper. The police were called and, upon arrival at Ms. P.'s home, removed the letters from the car's windshield.

One of the letters was addressed to appellant's daughter, Adriana. Appellant wrote, among other things:

I know your [sic] mad at daddy for hitting your mother but I had no control over that. I tried to warn her that I need you and her to help me because I was losing my mind. When I was hearing voices they want me to hurt you and her. But I no [sic] I will never harm you but I can't say that about her.

What I think I did to her is nothing compared to what was going to happen that day. I came there to kill her and that's the truth but when I was walking there from down the street I began seeing pictures of you in my mind of how

you would look, and I started crying because all I wanted was my little girl.

In a letter addressed to Ms. P., appellant wrote, among other things:

I tried and I tried to warn you, how my mind was becoming crazy.

\* \* \*

I'm sorry for hitting you but that was not me, I told you when I use drugs another personality comes out of me, and he came over there to kill you on that day, but when I started walking towards the house I began crying because I wanted my family back (you and Dinky) but you laughed at me not knowing all the pain I've had built up inside of me for years. You have [sic] better listen because the only thing that saved your life that day was Adriana and my love for her.

\* \* \*

This is how it's going to be[,] we will be a family together, or we (me & you) will die together because I couldn't hurt her.

If I see you with another man in these next few weeks I'm shooting no questions asked and that's a promise I will not break. I'm trying to warn you before I seriously hurt you, I think you now see what I'm capable of but that's nothing compared to what I have done before, and will do it again if necessary.

\* \* \*

[T]he way you saw me is not the way I always look, but I used so much drugs about 3 days before you seen [sic] me.

\* \* \*

I'm sorry for hitting you and if we become a family again it would never happen again, I promise.

\* \* \*

Rember [sic] that was a gun in my hand and I had intended to kill you that morning not me.... (I'm warning

you for the last time[.] ) Take this very seriously[.] I will be watching you very closely[.] No men around you or her, you have until December 27 after that, no more warnings. This time it will not be years to come there but hours.

\* \* \*

P.S. You no [sic] how my temper was, now it's 5 times crazier, only when I do drugs. If y'all return never again will I do them[,] if not prepare for the worst. Do you know I still don't even know if I came [over] there for real, or if it was a dream. I woke up with blood all over my hands[.]

On a subsequent day, Ms. P. found two more letters placed under her car's windshield wiper. Again, the letters were in appellant's handwriting. Again, Ms. P. called the police, who came and removed the letters from the windshield. The letter addressed to Adriana stated, among other things,

Your no good mother has only ten days before the killing starts. . . . On your life and your sister somebody will die over there, and it might even be you.

\* \* \*

She just doesn't no [sic] how crazy and violent I've become all because of my love for you.

I'm tired of looking at your pictures[,] the ones I have left and didn't tear up. My moods v[a]ry so much I never no [sic] what I'll do. But I do no [sic] you could change my whole way of life, but there is not a lot of time. Whatever happens I will always love you. But time is near and I'm not playing.

The letter addressed to Ms P. stated, among other things: "You have ten days left or the killing starts. Don't think [the] police can stop me[,] they can't stop me. . . . Play and you will die in ten days. But your [sic] not the only one, I will kill whoevers [sic] around when we kick those doors in. Bullets will ring out. . . ."

On the morning of December 14, Ms. P. went with her children next door to her babysitter's house to ask the babysitter a question. As they were leaving the babysitter's house,

Ms. P. saw appellant driving "up the street" in the cream colored Jeep he had driven on the day he had assaulted her a month earlier.

Ms. P. told the children to "[h]urry up [and] [g]et in the car." As appellant drove closer, however, Ms. P. told them instead to "run to the house." She and her children ran into her house and called the police.

On December 16, a book bag was left on Ms. P.'s car windshield. Ms. P. called the police, who came and retrieved the book bag. Inside the book bag was children's clothing, a basketball, and a note pad on which two letters were written by appellant. The letter addressed to Adriana had written on the top of it: "the day you saw me." In it appellant wrote, among other things:

> You do not have to run from daddy because of what your mother said to you or says to you about me.... It hurt me very badly when she told you to run in house, from me.... [N]ow she has made me more angry than I've ever been at her. I started to shoot her right there for telling you to run from me.... What I'll do if I'm not allowed to see you a lot of people over there are going to get hurt badly. I have enough guns to kill everybody in that house except you .... I've not even used drugs since I hit [Ms. P.] because I felt bad it had to come to that.
>
> \* \* \*
>
> [I]f that's her son that was with y'all [sic], I'm going to show her how it [feels] to take a child from it's parent and then, den[y] me of what Allah gave me. If I do not hear from y'all [sic], I will declare Jihad on her and everybody over there....
>
> But I will warn her no more.... I still have three cars so she won't know what I'm driving next time.... I see she still the stupid (B) I met 10 years ago, that I should [have] left alone the night I met her.....

The second letter was addressed to Ms. P. In it appellant wrote, among other things:

> You've really done it [this] time, I left that note on your car for a reason. I said I was sorry because I was using drugs

when I hit you[,] it wasn't me who hit you but voices made me do it. . . . But a strong warning to you, do not ever tell my daughter to run from me again or I'll shoot you on the spot I promise that on drugs or not. . . . Don't think that's my only car because I have 2 more and plenty of bullets to go around. I started

to stay there and shoot it out with police that came. . . . You have until the 27th Dec and I don't care how many kids you got, but it's me or the grave yard. That Jeep you seen [sic] was going to yours. . . .

[T]hat little boy will be first to go I promise that on my daughter's life the 27th is all you have [ ] as you can see I'm not playing no more. I'm watching you even when you think I'm not there believe [me], make a mistake like this today and tell my daughter to run from me will cost you your life next time.

Appellant testified in his defense. He admitted going to Ms. P.'s house on November 17. He explained that he had been "doing cocaine" for three days and was hearing voices. The voices kept telling him to "Go get your daughter." He remembered asking Ms. P., "Where['s] my daughter?" He told Ms. P. that he loved his daughter, that he wanted to stop "doing coke," and the only way he was going to stop was to make Adriana a promise. Appellant testified that he had told Ms. P. their "daughter was going to end up to be no freak like her," to which she responded by kicking him. Appellant then pushed Ms. P., causing her to fall into her car seat. He saw that her head was bleeding. Appellant denied ever having a weapon or a gun and he denied striking her in the head with a gun.

Appellant admitted writing the letters we have mentioned, but claimed that he wrote them to Ms. P. in 1994.

## DISCUSSION

Appellant challenges the legal sufficiency of his stalking conviction. The stalking statute in effect at the time of appellant's actions read, in pertinent part, as follows:

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Course of conduct" means a persistent pattern of conduct, composed of a series of acts over a period of time, that evidences a continuity of purpose.

(3) "Stalking" means a malicious course of conduct that includes approaching or pursuing another person with intent to place that person in reasonable fear:

(i) Of serious bodily injury or death; or

(ii) That a third person likely will suffer serious bodily injury or death.

(b) *Prohibited conduct.*—A person may not engage in stalking.

Md.Code (1957, 1996 Repl.Vol., 2001 Supp.), Art. 27, § 124.[2]

Appellant argues that the terms "approaching" and "pursuing" in subsection (3) require that the stalker act "in the victim's presence and with the victim's awareness." From this, appellant asserts that the letters he left on three occasions on the windshield of Ms. P.'s car do not come within the statute's prohibition, because there was no evidence that he acted in her presence. In a similar vein, appellant asserts that his conduct on December 14 does not come within the statute's prohibition, because he was *only* driving down the street, and not "approaching or pursuing" Ms. P. He concludes that, because none of these acts can properly be considered in determining whether he engaged in a malicious "course of conduct" requiring a "series of acts," what remains is the single act of his assault upon Ms. P. on November 17, which cannot alone establish the course of conduct needed for conviction of stalking.

The State responds that the malicious course of conduct required by the stalking statute is not limited to conduct

---

**2.** The stalking statute has been recodified without substantive change and is now located at Maryland Code (2002), §§ 3–801 to 3–802 of the Criminal Law Article. Hereafter, all references to the statute are to the version in effect in 2001.

involving the defendant's "approaching or pursuing" the victim, because the statute provides that the prohibited course of conduct merely "includes" approaching or pursuing the victim. Even so, the State additionally argues, the phrase "approaching or pursuing" does not require that the victim be actually present for and aware of the conduct.

Resolution of the parties' arguments requires that we employ principles of statutory construction.[3] The cardinal rule of statutory construction "is to discover and effectuate the actual intent of the legislature." *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004). Our inquiry begins with an examination of the plain language of the statute. *Id.* "We view the words of a statute in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood." *Gillespie v. State,* 370 Md. 219, 222, 804 A.2d 426 (2002). "If the words of a statute are clear and unambiguous, our inquiry ordinarily ends and we need investigate no further, but simply apply the statute as it reads." *Id.* We may neither add words to or delete words from "an unambiguous statute in an attempt to extend the statute's meaning." *Id.*

"Giving the words their ordinary and common meaning in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence, normally will result in the discovery of the Legislature's intent." *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993) (internal citations and quotation marks omitted). "In the interest of completeness, however, we may look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." *Id.; accord Chilcoat v. State,* 155 Md.App. 394, 405, 843 A.2d 240, *cert. denied,* 381 Md. 675, 851 A.2d 594 (2004).

---

**3.** Appellant did not argue before or at trial, and does not argue here, that the statute is in any sense unconstitutional.

■■■ The statute we construe in this case is penal. As the Court of Appeals has observed, "It is a fundamental principle of statutory construction that criminal statutes are to be construed narrowly so that courts will not extend the punishment to cases not plainly within the language used." *Boffen v. State*, 372 Md. 724, 735, 816 A.2d 88 (2003) (citations and internal quotation marks omitted). But, "[w]hile penal statutes are to be strictly construed in favor of the defendant, the construction must ultimately depend upon discerning the intention of the Legislature when it drafted and enacted the law in question." *Garnett v. State*, 332 Md. 571, 585, 632 A.2d 797 (1993).

### The Meaning of "Includes"

■■■ We first consider the State's argument that the stalking statute is not limited to a malicious course of conduct that involves "approaching or pursuing" the victim, because the statute merely "includ[es]" such conduct. Article I, § 30 of the Maryland Code states: "The words 'includes' or 'including' mean, unless the context requires otherwise, includes or including by way of illustration and not by way of limitation." Md.Code (1957, 2001 Repl.Vol.), Art. 1, § 30. *See also State v. Wiegmann*, 350 Md. 585, 593, 714 A.2d 841 (1998) ("Ordinarily, the word 'including' means comprising by illustration and not by way of limitation.") (citation and internal quotation marks omitted).

Nevertheless, the Court of Appeals has observed that "the term 'includes,' by itself, is not free from ambiguity." *Liverpool v. Baltimore Diamond Exchange Inc.*, 369 Md. 304, 321, 799 A.2d 1264 (2002). The Court said in *Liverpool:*

"Includes" has various shades of meaning, and its interpretation "depends upon the context" in which the term is used. We have said that "[o]rdinarily, the word 'include[s]' means comprising by illustration [of a general term] and not by way of limitation." We have also stated the term "includes" may "signal an expansion in meaning of previous language," and may be interpreted to mean "and" or "in addition to."

It has also been construed as a word of limitation or restriction.

369 Md. at 321–22, 799 A.2d 1264 (citations and some internal quotation marks omitted).

As it is used in the stalking statute, the word "includes" is a term of limitation or restriction. The sentence in which the term appears reads: " 'Stalking' means a malicious course of conduct that includes approaching or pursuing another person with intent to place that person in reasonable fear: (i) Of serious bodily injury or death; or (ii) That a third person likely will suffer serious bodily injury or death." § 124(a)(3). Thus employed, the word "includes" has a meaning akin to "comprehends" or "embraces." *See Helvering v. Morgan's Inc.*, 293 U.S. 121, 125, 55 S.Ct. 60, 79 L.Ed. 232 (1934). In other words, whatever else the course of conduct referred to in subsection (3) might involve, it *must* include the stalker's "approaching or pursuing" the victim. Indeed, when the sentence that is subsection (3) is read in its entirety, and consideration is given to its structure and punctuation, we can discern no other reasonable interpretation of it.

Our interpretation of "includes," moreover, adheres to the rule that penal statutes are to be construed strictly in favor of the defendant. We hold, therefore, that the crime of stalking requires proof that the defendant's malicious course of conduct involves, at the least, "approaching or pursuing" the victim with the requisite intent of placing the victim in fear of serious bodily harm to the victim or some other person.

### The Meaning of "Approaching or Pursuing"

We next must decide what the Legislature meant by its use of the phrase "approaching or pursuing" the victim. As appellant would have it, these words "contemplate a physical proximity between the person doing the approaching or pursuing and the victim," requiring "a series of acts [on the part of the stalker] in the victim's presence and with the victim's awareness." The State responds that appellant's construction is too restrictive. The State, however, does not offer an alternative construction of the words.

**14**

 "Ordinary and popular understanding of the English language dictates interpretation of terminology within legislation." *Deville*, 383 Md. at 223, 858 A.2d 484. We may consult a dictionary to discern the generally understood meaning of a word. *Hamwright v. State*, 142 Md.App. 17, 30 n. 4, 787 A.2d 824 (2001), *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002). The first definition given for the word "approach" in WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY, 106 (2002) is: "To come or go near or nearer to in place or time: draw nearer to." Likewise, THE AMERICAN HERITAGE DICTIONARY 122 (2nd College ed.1985) defines "approach," first, as: "To come or go near or nearer to." The first definition of the word "pursue" in Webster's is "to follow with enmity." WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 1848 (2002). And in THE AMERICAN HERITAGE DICTIONARY 1006 (2nd College ed.1985), "pursue" is first defined as: "To follow in an effort to overtake or capture; chase." None of these definitions of either "approach" or "pursue" requires that the person approaching or pursuing another person do so in the actual presence of the other person *and* with the concurrent awareness of that person, as appellant suggests. Rather, "[g]iving the words their ordinary and common meaning in light of the full context in which they appear," *Harris*, 331 Md. at 146, 626 A.2d 946, appellant's conduct comes within the meaning of one, if not both, terms.

 Our review of the legislative history of the stalking statute confirms this conclusion. Legislative history includes "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it...." *Boffen*, 372 Md. at 736–37, 816 A.2d 88 (citations and internal quotation marks omitted). The "prevailing mood of the legislative body with respect to the type of criminal conduct involved" may also be considered. *Randall Book Corp. v. State*, 316 Md. 315, 327, 558 A.2d 715 (1989).

Maryland's stalking statute became law in 1993. In the three years immediately prior to 1993, at least twenty-seven

other states enacted statutes that proscribed "stalking" in one form or another. *See* CONGRESSIONAL RESEARCH SERVICE REPORT FOR CONGRESS, ANTI-STALKING STATUTES: BACKGROUND AND CONSTITUTIONAL ANALYSIS, at 1 (September 26, 1992) ("CRS Report"). The CRS Report provides insight into the prevailing mood across the country at the time. The report refers generally to "stalking behavior" as "harassing or threatening behavior which an individual engages in repeatedly, such as following a person, appearing at a person's home or place of business, making harassing phone calls, leaving written messages or objects or vandalizing a person's property." *Id.* at 2. The CRS Report states further that the various stalking statutes sought to "address various perceived problems with how traditional criminal laws are applied to threatening behavior." *Id.* at 1. That is, "[c]ertain stalking behavior, although disturbing to the victim and often indicative of potential future harm, may not rise to the level of criminal activity under traditional criminal statutes, or it may violate laws under which only minimal sanctions can be imposed." *Id.*

It was against this backdrop of burgeoning interest in stalking legislation on the national front that the General Assembly took up the issue in 1993. Seven bills were introduced: Senate Bill ("SB") 7, SB 177, SB 260 and SB 277, House Bill ("HB") 6, HB 433 and HB 124. What eventually became the stalking statute originated as SB 7 and HB 433. As proposed, each of these bills differed markedly from the other, and both bills underwent significant amendment so that the identically worded bills that were enacted as 1993 Laws of Maryland, chs. 205 and 206, bear little resemblance to the originals.

The legislative history offers no guidance about the evolution of the bills' wording. Moreover, nothing in the history informs the General Assembly's decision to adopt the "approaching or pursuing" language we analyze here. What little we do know in this regard follows.

SB 7, in its original form, defined stalking as meaning "to harass or repeatedly follow another person in such a manner

as: (I) to cause that person to suffer substantial emotional distress; and (II) would cause a reasonable person to suffer substantial emotional distress." "Harass" was defined in the original SB 7 as "a course of conduct directed at a specific person which would cause a reasonable person to fear bodily injury or death, including oral threats, written threats, vandalism, or nonconsensual physical contact." "Follow," in turn, was defined as "to maintain a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to fear bodily injury or death." As the bill moved through the Senate, the phrase "harass or repeatedly follow" was dropped in favor of the language that was passed into law, and stalking became defined as a malicious course of conduct that includes the stalker's "approaching or pursuing" the victim.

HB 433 underwent a similar metamorphosis. As introduced, HB 433 provided that "a person may not stalk another person," and defined "stalk" as meaning

> to engage in a knowing and willful course of conduct that involves an express or implied threat to kill another person or to inflict bodily injury on another person that is made: (I) with the intent to place that person in fear of bodily injury or death; and (II) in any manner or context that causes that person to reasonably fear bodily injury or death.

HB 433 was eventually amended to delete this definition of "stalk" in favor of the amended definition in SB 7. *See* SENATE JUDICIAL PROCEEDINGS COMMITTEE, FLOOR REPORT, HB 433, 1993 General Assembly (Md.1993) ("Floor Report")(reporting HB 433 "favorably," with the adoption of one amendment that struck "the entire bill and substitute[d] the language of Senate Bill 7").

This history offers little guidance on the General Assembly's decision to settle on what became the definition of stalking. And it provides no indication of how or why the General Assembly chose to include the words "approaching or pursu-

ing" in defining the proscribed conduct.[4]

The history does shed light, however, on the General Assembly's purpose in enacting the stalking statute. As with similar legislation in other states, *see* CRS REPORT at 1–2, the General Assembly sought to fill a gap in the law. The BACKGROUND portion of the Floor Report reads, in part:

> Under current law, two criminal offenses—assault and harassment—relate to threatening conduct. Neither, however, fully addresses the type of behavior that is the subject of this bill. Civil protective orders also are an avenue to obtain redress in stalking situations, but they offer a less effective remedy than a criminal statute.
>
> ∗ ∗ ∗
>
> The crime of assault is not necessarily committed in a stalking situation because one element of the crime of assault is the present intention and capacity to inflict a battery. In stalking situations there is not always an "immediate" threat of harm or injury. Rather, the stalker may be threatening, either expressly or implicitly, to harm a person at some time in the future. For example, a man who makes threatening telephone calls to his ex-wife several times a week would probably display the type of stalking behavior covered by the bill, he would not be guilty of

---

4. We have reviewed the statutes of other jurisdictions that expressly proscribed "stalking," and were on the books in the Spring of 1993, when the General Assembly was considering its stalking legislation. We found only two that used the word "pursue," in one form or another, HAW REV STAT ANN § 711–1106.5; IOWA CODE ANN § 708.11, and none that used the word "approach."

The majority of these statutes use the word "follow," in one form or another. *See* ALA CODE § 13A–6–90; CAL.PENAL CODE § 646.9; COLO.REV STAT § 18–9–111; CONN. GEN STAT. § 53a–181d; DEL CODE ANN tit. 11, § 1312; FLA STAT ANN. § 748.04; IDAHO CODE § 18–7905; ILL COMP STAT 5/12–7.3; KAN STAT ANN. § 508.130; LA REVS STAT ANN § 14:40.2; MASS GEN LAWS ch. 265, § 43; MISS.CODE ANN § 97–3–107; N.J. STAT. ANN. § 2C:12–10; N.C. GEN STAT § 14–277.3; OKLA STAT ANN. tit. 22, § 60.1; R.I. GEN LAWS § 11–59–2; S.C.CODE ANN § 16–3–1070; S.D. CODIFIED LAWS § 22–19A–1; TENN CODE. ANN. § 39–17–315; UTAH CODE ANN. § 76–5–106.5; WASH. REV.CODE § 9A.46.110; W. VA CODE § 61–2–9a.

assault unless he showed the present intent and means to injure his ex-wife on the spot.

SENATE JUDICIAL PROCEEDINGS COMMITTEE, FLOOR REPORT, HB 433, 1993 General Assembly (Md.1993).

The Floor Report also explained "why [the] current crime of 'harassment' "[5] was not an "appropriate tool for dealing with stalkers":

First, [harassment] include[s] elements that should not be included in the crime of stalking. For example, it is not always possible or feasible in [a] stalking situation for the victim to provide a reasonable warning or request to "desist". Second, because [harassment] is a misdemeanor and not a felony, a police officer may not arrest a person for [harassment] without a warrant unless the person actually commits the crime in the presence of, or within the view of, the officer.[6] By making the crime of stalking a felony, the

---

5. The harassment statute, in the form it took at the time at issue, provided, in pertinent part:

(a) *Course of conduct defined.*—In this section "course of conduct" means a persistent pattern of conduct, composed of a series of acts over a period of time, that evidences a continuity of purpose.
(b) *Applicability.*—This section does not apply to any peaceable activity intended to express political views or provide information to others.
(c) *Prohibited conduct.*—A person may not follow another person in or about a public place or maliciously engage in a course of conduct that alarms or seriously annoys another person:
(1) With intent to harass, alarm, or annoy the other person;
(2) After reasonable warning or request to desist by or on behalf of the other person; and
(3) Without a legal purpose.
Md.Code (1957, 1996 Repl.Vol., 2001 Supp.), Art. 27, § 123. The harassment statute has since been re-codified, without substantive change, and is located at Maryland Code (2002), §§ 3–801, 3–803 of the Criminal Law Article. For a discussion of the constitutionality of the harassment statute, see *Galloway v. State*, 365 Md. 599, 781 A.2d 851 (2001), *cert. denied*, 535 U.S. 990, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002).

6. The bills that were signed into law classified stalking as a misdemeanor, not a felony. The General Assembly, however, set the penalty for stalking at "a fine of not more than $5,000 or imprisonment for not more than 5 years or both." 1993 Laws of Maryland, ch. 205 at 1522;

bill permits a police officer to arrest an alleged stalker without a warrant when the officer has probable cause to believe that the person has committed the crime of stalking, regardless of whether the crime has been committed in the officer's presence or view. Finally, the current penalties for harassment ... do not reflect the seriousness of the crime of stalking. [HB 433] imposes more severe penalties on a person who commits the crime of stalking.

*Id. See also* Hearing on SB 7 Before the Senate Comm. on Judicial Proceedings, 1993 Gen. Assembly (Md.1993) (statement of Sen. Nancy Murphy, sponsor of SB 7) (noting that stalking situations do not always involve an immediate threat of harm or injury, and citing as an example of behavior covered by SB 7 a man who makes a series of threatening calls to his ex-wife); Hearing on HB 433 Before the House Comm. on the Judiciary, 1993 Gen. Assembly (Md.1993) (statement of Del. Joan B. Pitkin, co-sponsor of HB 433) (citing as an example of stalking a man's verbally harassing the victim by telephone and persistently following her at a distance).

This history reflects that the General Assembly did not intend the stalking statute's requirement of a "malicious course of conduct that includes approaching or pursuing another person" to be limited to conduct that is done in the victim's actual physical presence and with the victim's concurrent awareness. Indeed, the Floor Report (as well as the testimony of the bills' sponsors) cites as an example of the behavior intended to be covered by the statute a man's making threatening telephone calls several times a week to his ex-wife. Obviously, in that example, the malicious conduct does not occur in the victim's actual presence.

We need not decide in this case the breadth of conduct that falls within the meaning of the stalking statute. It is suffi-

ch. 206 at 1527. The penalty for stalking far exceeded what at the time was the penalty for harassment ("a fine not exceeding $500 or imprisonment for not more than 30 days."), Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 121A. This difference in severity of penalty reflects the Legislature's recognition of stalking as a more serious crime than harassment.

cient for resolution of this case that we decide whether appellant's conduct of placing threatening letters on Ms. P.'s car windshield comes within the statute's prohibition.

We conclude that it does. Appellant delivered his frightening messages by placing them on Ms. P.'s car, where she would be certain to see them. To do this, appellant had to approach the immediate environs of Ms. P.'s home, where her car was parked. This conduct meets the statute's requirement of malicious conduct that involves "approaching" Ms. P.

We come to the same conclusion about appellant's conduct in driving his car down the street in front of Ms. P.'s home. We note that appellant did this at the same time of day as on the morning he assaulted Ms. P., permitting the inference that he hoped to encounter her. Moreover, as evidenced by the letters he left for Ms. P. and Adriana two days later, appellant was close enough to them at the time he was driving down the street to witness their flight into their home. Appellant's "drive-by" qualifies as both "approaching" and "pursuing" Ms. P.

### "Course of Conduct"

█ Because we have concluded that each of these acts— the letter placements and the drive-by—satisfies the conduct proscribed by the stalking statute, it follows that we may consider each act in determining whether appellant engaged in the "course of conduct" required by the statute. The statute defines "course of conduct" as "a persistent pattern of conduct, composed of a series of acts over a period of time, that evidences a continuity of purpose." § 124(a)(2). The evidence was legally sufficient to meet this element of the statute.

The jury heard evidence that over the course of several weeks appellant did the following: He assaulted Ms. P. and beat her with a handgun; twice over the next several weeks he delivered to Ms. P. and Adriana letters that harkened back to his assault upon Ms. P. and threatened imminent deadly harm to Ms. P. and her children; several days after the delivery of the second set of letters he again drove down the

street in front of Ms. P.'s home, causing her to retreat into her home in fear; then, two days after that, he delivered two more letters that expressed anger at Ms. P.'s retreat to safety with her children, said that he had "started to shoot [Ms. P.] right there," and threatened to shoot Ms. P. if she ever again told Adriana to run from him.

Bearing in mind that we review convictions for legal sufficiency by examining the evidence in the light most favorable to the State, *Harrison v. State*, 382 Md. 477, 487, 855 A.2d 1220 (2004), we hold that the evidence was sufficient to sustain appellant's conviction of stalking. We affirm that judgment, accordingly.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**