983 A.2d 583

**Rodney Taureen MOORE**

v.

**STATE of Maryland.**

**No. 76, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Nov. 24, 2009.

Martha Weisheit (Nancy S. Forster, Public Defender, on brief), baltimore, for Appellant.

James E. William (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI, and PAUL E. ALPERT, (Retired, Specially Assigned), JJ.

ALPERT, J.

Appellant, Rodney Taureen Moore, was indicted in the Circuit Court for Baltimore County, Maryland, and charged with attempted first degree murder, first degree assault, armed robbery, and various handgun offenses, including illegal possession of a regulated firearm by a person previously convicted of a disqualifying offense, pursuant to Md.Code (2003), § 133(c)(1)(ii) of the Public Safety Article. ("P.S.") On February 13, 2008, appellant made a motion *in limine* requesting the circuit court to determine, as a matter of law, whether this illegal possession statute applied to an inoperable handgun. After hearing argument, the circuit court denied appellant's motion. Thereafter, appellant entered a not guilty plea on an agreed statement of facts, and the circuit court found appellant guilty of illegal possession of a regulated firearm, with the remaining counts nol prossed. Appellant was then sentenced to five years without possibility of parole.

Appellant timely appealed, and presents two questions for review, which we have rephrased as follows:

 1. Did the trial court correctly determine that operability of a firearm is not a prerequisite to a conviction of illegal possession of a regulated firearm?

 2. Was the evidence sufficient to sustain appellant's conviction of illegal possession of a regulated firearm? [1]

For the following reasons, we shall affirm.

---

1. Appellant's two questions presented were:

 1. Did the circuit court apply an improper standard in determining that proof of the operability of a firearm was unnecessary to a conviction of illegal possession of a regulated firearm under the Public Safety Article, section 5–133(b)?

## BACKGROUND

Appellant was charged with a number of offenses in connection with a robbery and shooting that took place in Baltimore County on July 5, 2007. Among other charges, appellant was charged pursuant to P.S. § 5–133(c), with illegal possession of a regulated firearm by a person previously convicted of a disqualifying offense.

On February 13, 2008, appellant made a motion in the circuit court requesting the court to determine as a matter of law whether a conviction under that statute required proof of the operability of the firearm. Defense counsel argued that P.S. § 5–133(c) did not address operability, unlike the pertinent handgun offenses under the Criminal Law Article. *See* Md.Code (2002, 2008 Supp.), §§ 4–201–4–209 of the Criminal Law Article ("C.L."). Defense counsel made clear that he did not want the circuit court to decide whether the firearm recovered in this case was operable or inoperable as that would be an issue for the finder of fact.

After hearing argument, the circuit court determined that the underlying issue required it to interpret P.S. § 5–101(h), regarding the definition of a "firearm."[2] The court concluded that the definition of a firearm provided in Section 5–101(h) was unambiguous, and under the plain and ordinary meaning, a "firearm means a weapon that expels, is designed to expel or may readily be converted to expel a projectile." The court denied the motion to exclude the gun, stating: "So I find that, for there to be a conviction under Section 5–133 of the Public Safety Article, the handgun does not have to be operable when in possession of the defendant for the crime to be committed."

Thereafter, on February 21, 2008, appellant entered a not guilty plea on an agreed statement of facts. The parties

---

2. Was the evidence insufficient to show that the weapon at issue could be "readily" converted into a firearm?

**2.** P.S. § 5–101(h) provides that: "(1) 'Firearm' means: (i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or (ii) the frame or receiver of such a weapon. (2) 'Firearm' includes a starter gun."

agreed the evidence would show that this case concerned a robbery and shooting in Baltimore County that occurred on July 5, 2007. During the course of the ensuing investigation, appellant was initially implicated in the underlying offense, and a search warrant was executed at appellant's residence. Pertinent to the issue on appeal, the parties agreed:

When the tactical squad entered, they found this defendant, Rodney Moore, and his girlfriend in bed in the master bedroom, and they also recovered a handgun that was under the bed where the defendant was sleeping. They described the gun as in close proximity to this defendant.

The gun recovered was a .32 caliber revolver, Harrington and Richardson, Model II. It was a hinge frame revolver. It did bear a proper serial number.

The detectives also recovered underneath the bed a shell casing, a fired casing and projectile. Both of those items were wrapped in a paper towel under the very same bed. Additionally, when the handgun was recovered, detectives checked it to make sure it was safe, and they did find that it had one loaded round in the cylinder. Those items were properly seized and packaged and sent to the lab for analysis additionally.

This defendant, Rodney Moore, was lawfully arrested. At that point, he also had been advised of his Miranda rights.

The handgun had been sent for more forensic examination to the Baltimore County crime lab. Michael Thomas, a firearms examiner, did analyze both the handgun, as well as the fired casing and the fired projectile.

Mr. Thomas's findings, specifically with regard to the handgun, was that it was defective. Though defective, it was tested and found to fire. Mr. Thomas, for his own safety, replaced a latch on the handgun that was cracked in order to test fire the gun. Once he did so, it did. It was found to properly function and fire.

If Mr. Thomas were called to testify, he would be offered as an expert in forensic or in firearm identification. He

would indicate that he, although defective, he did essentially fix the handgun for his own safety. He would indicate, if he would not have fixed the handgun and test fired it, the gun would have gone off, but it could have exploded or the shell casing could have come back and hit him in the head, and that was reason for fixing the gun, and that is for his own safety.

The shell casing that was recovered at the scene was also analyzed. It was found to have been fired from that very same handgun, the recovered handgun. In terms of that fired projectile recovered from the scene, Mr. Thomas could not make any determination whether that projectile was or was not fired from that handgun.

Appellant waived his rights and told police that the gun belonged to a friend. The parties also agreed to the following:

[T]he defendant, on May 5th, 2005, was convicted of a crime which prohibits him from possessing a regulated firearm. As I indicated, he was convicted May 5th, 2005, of possession with intent to distribute cocaine. He was convicted in Baltimore City, and his sentence was two years, suspend all but a month, probably a time served type of sentence.

He is prohibited from possessing a regulated firearm. The .32 caliber revolver in this case is a regulated firearm. It is a handgun with a barrel of less than 16 inches in length, and it expels—is designed to expel or may readily be converted to expel a projectile by action of an explosive, and at a minimum is certainly also a frame of such a weapon.

The court was then informed that, during the course of the subsequent investigation, neither the victim nor other witnesses could identify appellant as being involved in the underlying crime. However, there was no dispute that the police had probable cause to search appellant's home. The parties also agreed to stipulate to appellant's prior conviction.

After hearing these agreed facts from the prosecutor, defense counsel offered the following additions and modifications to the agreed facts:

Your Honor, by way of additions or modifications, Your Honor, in addition to the expert finding, that would have been testified to concerning the test firing of the gun, itself, the latch, itself, was repaired, actually replaced from another gun. It was taken from another gun and placed onto that gun.

Also defective in the gun was what is called a recoil cap, which is where the hammer engages the back of the shell. That was actually missing from the gun, which would cause one to fire the gun to have to clear the chamber and remove residue or bullet material that would be in there, in order to get the gun to fire again.

Also, what would have been testified to was that, when test firing the gun, the actual ammunition being used in the gun in its current state was .38 automatic ammunition, the problem being the gun, itself, was a revolver. So in order for it to be test fire[d], the expert actually took a regular .38 Smith and Wesson casing made for the revolver and replaced it with an automatic bullet, making a new bullet to further ensure the safety of the test fire, itself.

So the only addition or modification placed on the record or that I would like placed on the record is that the gun, in the condition in which it was found, was never test fired. The testimony of the expert was that he believes it would have fired in some way. Whether the bullet went sideways, forward or backward is still open to conjecture.

The prosecutor agreed with defense counsel's additions and modifications, with the exception that the expert used a .32 caliber bullet in the test fire. Both parties agreed that the expert used a "smaller cartridge to reduce the stress on the gun and made a new cartridge to place in the gun." Defense counsel further agreed that the gun "was designed, in fact, to propel a projectile." Nevertheless, defense counsel renewed his arguments and motion from the prior hearing that operability was a consideration under P.S. § 5–133(c).

The court denied these motions and found appellant guilty of a violation of P.S. § 5–133(c). The court then sentenced

appellant to the mandatory minimum of five years without possibility of parole. This appeal followed.

## DISCUSSION

### I.

 Appellant maintains that the circuit court erred because, he contends, in order to be convicted under P.S. § 5–133(c), the State must prove operability of the firearm. The State disagrees, averring that the plain language of the statute defining a firearm, P.S. § 5–101(h), does not include any requirement that the firearm must be operable.

Although appellant asked the circuit court to decide a threshold legal issue by way of a motion *in limine* to exclude the gun recovered in this case, essentially, appellant asked the court to first decide the legal sufficiency of the evidence before addressing, in a later hearing, whether the underlying facts could sustain a conviction under P.S. § 5–133(c). In reviewing the sufficiency of the evidence following an action tried without a jury, Maryland Rule 8–131(c) provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

 Further, following a bench trial, the test for sufficiency of the evidence is whether that evidence, if believed, directly or inferentially permits the court to be convinced, beyond a reasonable doubt, of the defendant's guilt. *State v. Smith,* 374 Md. 527, 533–34, 823 A.2d 664 (2003); *accord State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998). In considering the legal sufficiency of the evidence following a non-jury trial, the appellate court must determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v.*

*Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)). "When the trial court's order 'involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.' " *Gray v. State,* 388 Md. 366, 374–75, 879 A.2d 1064 (2005) (quoting *Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879 (2004)).

Here, appellant was charged in Count 9 of the indictment with illegal possession of a regulated firearm as enumerated in P.S. § 5–133(c)(1)(ii). That statute states:

(c) Penalty for possession by person convicted of crime of violence.—

(1) A person may not possess a regulated firearm if the person was previously convicted of:

(i) a crime of violence; or

(ii) a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–606, § 5–607, § 5–608, § 5–609, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article.

P.S. § 5–133(c).

A "regulated firearm" is defined as a "handgun" or a firearm that is one of any number of delineated assault weapons. P.S. § 5–101(p). A "handgun" is defined as "a firearm with a barrel less than 16 inches in length," as well as "signal, starter, and blank pistols." P.S. § 5–101(n). This last definition leads us to the definition of a "firearm" which is provided in P.S. § 5–101(h), as follows:

(h) Firearm.—

(1) "Firearm" means:

(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or

(ii) the frame or receiver of such a weapon.

(2) "Firearm" includes a starter gun.

P.S. § 5–133(h).

The issue presented is one of statutory construction. The Court of Appeals has stated:

> We have stated the controlling principles of statutory construction so often that only the briefest exposition is necessary. Our predominant mission is to ascertain and implement the legislative intent, which is to be derived, if possible, from the language of the statute (or Rule) itself. If the language is clear and unambiguous, our search for legislative intent ends and we apply the language as written in a commonsense manner. We do not add words or ignore those that are there. If there is any ambiguity, we may then seek to fathom the legislative intent by looking at legislative history and applying the most relevant of the various canons that courts have created.

*Downes v. Downes,* 388 Md. 561, 571–72, 880 A.2d 343 (2005); *see also Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175 (2006) ("where an order [of the trial court] involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review").

■ The starting point for statutory interpretation is the plain language of the statute itself. *See Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699 (Md.2007) ("We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory'") (citations omitted); *see also State v. Brantner,* 360 Md. 314, 320, 758 A.2d 84 (2000) ("This requires reading and interpreting the entire statute, neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used").

■ Further, where the words of the statute are clear and unambiguous, there usually is no need to go further in construing the statute. *See Derry v. State,* 358 Md. 325, 335, 748

A.2d 478 (2000) ("If the words of a statute clearly and unambiguously delineate the legislative intent, ours is an ephemeral enterprise: we need investigate no further but simply apply the statute as it reads"); *see also Gargliano v. State*, 334 Md. 428, 435, 639 A.2d 675 (1994) ("If the language of the statute is plain and clear and expresses a meaning consistent with the statute's apparent purpose, no further analysis is ordinarily required").

The definition of "firearm" provided in P.S. § 5–101(h) includes "a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive." P.S. § 5–101(h)(1)(i). Although the words "operable" or "inoperable," are not specifically included within this definition, the actual wording of the statute gives meaning to those same concepts. A "weapon that expels" clearly refers to a weapon that fires a projectile, *i.e.*, an operable weapon. The issue appellant wants us to decide is whether a weapon "designed to expel" or one that "may readily be converted to expel" also only refers to operable weapons.

 "Ordinary and popular understanding of the English language dictates interpretation of terminology within legislation." *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484 (2004). Consequently, "[w]e may consult a dictionary to discern the generally understood meaning of a word." *Hackley v. State*, 161 Md.App. 1, 14, 866 A.2d 906, *aff'd*, 389 Md. 387, 885 A.2d 816 (2005). The ordinary meaning of "designed," means: "a. Marked out, appointed, designate. b. Planned, purposed, intended. c. Drawn; outlined, formed, fashioned, or framed according to design." 4 *The Oxford English Dictionary*, p. 521 (2d ed. 1989) ("*O.E.D.*"). "Designed" also means: "done, performed, or made with purpose and intent often despite an appearance of being accidental, spontaneous, or natural." *Webster's Third New International Dictionary of the English Language*, p. 612 (2002) ("*Webster's* ").

Considering this, a weapon "designed to expel" means one planned, purposed, or intended to expel a projectile by an explosive. Whether that weapon does or does not actually

expel a projectile is of no consequence, so long as that weapon was originally fashioned or framed with that purpose in mind. Therefore, we conclude that operability is not a requirement where a firearm is a weapon designed to expel a projectile.

As for a weapon that "may readily be converted to expel," the definition of "converted" includes "[c]hanged into some-thing else," 3 *O.E.D.*, at 873, or "c (1): to change or turn from one use, purpose, or function to another . . . (2): to remodel in order to accommodate to a new manner of operation or change from one type to another . . ." *Webster's*, at 499. "Readily" means "in a ready manner . . . a: with prompt willingness . . . b: with fairly quick efficiency: without needless loss of time: reasonably fast . . . c: with a fair degree of ease: without much difficulty: with facility: easily . . ." *Webster's*, at 889, as well as "[p]romptly, in respect of the time of the action; quickly, without delay; also, without difficulty, with ease or facility." 13 *O.E.D.*, at 264.

Based on this, a weapon that "may readily be converted to expel" is one that promptly, easily and without much difficulty can be changed or turned into a weapon that may expel a projectile by the action of an explosive. This might include a previously inoperable weapon. Thus, this provision also does not require proof of operability before the weapon is consid-ered a firearm under P.S. § 5–101(h).

Finally, under the statute, a "firearm" may also simply be "the frame or receiver of such a weapon." P.S. § 5–101(h)(1)(ii). Clearly, this subsection does not depend upon proof of operability of the weapon.[3]

Accordingly, under the plain and ordinary meaning of the words in Section 5–101(h), proof that a weapon is a firearm

---

3. Although "frame or receiver" is not defined in the Maryland statutes, we note that the Bureau of Alcohol, Tobacco, and Firearms regulations with respect to commerce in firearms and ammunition defines "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11.

does not depend on a showing that the weapon is operable. Even an inoperable weapon that is "designed to expel" or one that "may readily be converted to expel" a projectile via an explosive, is included within the definition of a "firearm" under Subtitle 1, Title 5, of the Public Safety Article ("Regulated Firearms").

Moreover, although our analysis could end here because the statute is not ambiguous, we also conclude that the legislative history supports our interpretation. *See Melton v. State,* 379 Md. 471, 476, 842 A.2d 743 (2004) ("the cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature") (citations omitted). The Revisor's Note to P.S. § 5–101(h) indicates that "[t]his subsection is new language derived without substantive change from former Art. 27 § 441(i)." Former Section 441(i) provided as follows:

(i) "Firearm" means:

(1) Any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; or

(2) The frame or receiver of any such weapon.

Md.Code (1957, 1996 Repl.Vol.), § 441(i) of Article 27 (superseded).

Section 441(i) was added as part of the Maryland Gun Violence Act of 1996. *See* 1996 Md. Laws, chs. 561, 562. Relevant to our discussion, one of the purposes of that Act included "revising, reorganizing, and clarifying certain laws pertaining to the sale, rental, or transfer of certain regulated firearms by certain individuals." 1996 Md. Laws, ch. 561, p. 3140. There is both a Senate and a House version of the bill, and the Senate Floor Report, as well as the House Judiciary Bill Analysis, provide the following summary:

This bill is aimed at reducing gun-related violent crime in Maryland with a two-fold approach.

First, the bill creates several new crimes involving the use or possession of firearms, increases the penalties for several current crimes relating to the use or possession of firearms,

and authorizes the courts and law enforcement authorities to take certain action regarding firearms in domestic violence situations.

Second, the bill makes several substantive, as well as non-substantive, changes to the current law governing the sale, transfer and possession of pistols, revolvers, and assault weapons (all included in the new term "regulated firearms" in the bill).

Bill Analysis, Senate Bill 215, House Judiciary Committee, p. 1; Floor Report, Senate Bill 215, Senate Judicial Proceedings Committee, p. 1; *see also* Briefing Statement by Chief Legislative Officer, Governor's Legislative Office, and Superintendent, Department of State Police, on Senate Bill 215 and House Bill 297, p. 2 ("To help accomplish this goal, the Maryland Gun Violence Act focuses on reducing the availability of handguns and assault weapons, which are defined in the bill as regulated firearms, to prohibited persons by diminishing the proliferation of illegal sales and transfers of firearms").

With respect to the definition of "firearm" in Section 441(i), the Floor Report states that this subsection provides a "[n]ew definition consistent with federal law." Floor Report, Senate Bill 215, p. 6. That the Legislature sought consistency with federal law is evident in much of the history of the Maryland Gun Violence Act of 1996. *See* Press Release from the United States Attorney for the District of Maryland (March 12, 1996) (providing details of a report from Baltimore Police Commissioner Thomas C. Frazier, United States Attorney Lynne A. Battaglia, State's Attorney for Baltimore City Patricia C. Jessamy and M. Stewart Allen, Special Agent in Charge of the Bureau of Alcohol, Tobacco and Firearms on the progress of the DISARM Program, a program designed to "combat gun-related violence in Maryland by seeking federal prosecution for felons who are arrested with a gun and who have a substantial record of convictions for violent and/or drug trafficking crimes").

Section 441(i) appears to be based on 18 U.S.C. § 921(a)(3), which defines a "firearm" as follows:

The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3); *see also* 18 U.S.C. § 922(g)(1) (making it unlawful for certain individuals, including those convicted of a crime punishable by incarceration exceeding a year, as well as unlawful users of controlled dangerous substances, from possessing a firearm).

In interpreting this statute, the federal courts have consistently held that Section 921(a)(3) does not require proof of operability of the firearm. *See United States v. Rivera,* 415 F.3d 284, 286 (2d Cir.2005) ("Where a weapon designed to fire a projectile is rendered inoperable, whether on purpose or by accident, it is not removed from the statute's purview; although it is temporarily incapable of effecting its purpose, it continues to be 'designed' to fire a projectile"); *United States v. Willis,* 992 F.2d 489, 491 n. 2 (4th Cir.1993) ("[O]ther courts of appeals that have addressed this issue have held consistently that there is no requirement that a firearm be operable in order to satisfy the definition contained in § 921(a)(3)"), *cert. denied,* 510 U.S. 857, 114 S.Ct. 167, 126 L.Ed.2d 127 (1993); *United States v. Ruiz,* 986 F.2d 905, 910 (5th Cir.1993) ("the filing down of the gun's hammer did not change the fact that the gun was designed to expel a projectile, but rather it merely temporarily altered the gun's capability to accomplish the purpose for which it was designed"), *cert. denied,* 510 U.S. 848, 114 S.Ct. 145, 126 L.Ed.2d 107 (1993); *United States v. Yannott,* 42 F.3d 999, 1006 (6th Cir.1994) ("the law is clear that a weapon does not need to be operable to be a firearm"), *cert. denied,* 513 U.S. 1182, 115 S.Ct. 1172, 130 L.Ed.2d 1125 (1995); *United States v. Buggs,* 904 F.2d 1070, 1075 (7th Cir.1990) ("The statute does not require that the Government prove the gun was actually capable of firing. Rather, it is enough that the gun was 'designed to' fire") (citation omitted); *United States v. Maddix,* 96 F.3d 311, 316 (8th Cir.1996)

("Title 18 U.S.C. § 921(a)(3) does not require a firearm to be operable"); *United States v. Morris,* 904 F.2d 518, 519 (9th Cir.1990) ("The statute imposes no requirement that the gun be loaded or operable") (citation omitted); *United States v. Adams,* 137 F.3d 1298, 1300 (11th Cir.Fla.1998) ("[We] hold that the government was not required to show that the firearm was operable for purposes of § 922(g)(1)").

Appellant wants us to find an operability requirement in the meaning of "firearm" under P.S. § 5–101(h), on the grounds that, when the predecessor statute was enacted at Article 27 § 441(i), the Legislature also amended former Article 27 § 36B (d), the criminal law provision governing use of a handgun in commission of a crime, as follows:

> (d) Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence as defined in § 441 of this article, *whether operable or inoperable at the time of the offense,* shall be guilty of a separate misdemeanor ...

1996 Md. Laws, chs. 561, 562 § 2 (emphasis added).[4]

The stated purpose of this revision was to expand "the separate crime of the use of a handgun in the commission of a crime of violence by making it clear that it does not matter whether the gun used was operable or inoperable." Bill Analysis, Senate Bill 215, House Judiciary Committee, p. 2; *see also* Briefing Statement, *supra,* p. 6 (stating that the revision "removes the current burden of proof on the State prosecutors to demonstrate that the gun was capable of being fired in order to obtain a conviction").

Appellant contends that, under the doctrine of "expressio unius est exclusio alterius," meaning, "the expression of one thing is the exclusion of another," "one must assume that the Legislature intended to eliminate proof of operability only with respect to offenses" under former Section 36B (d) of

---

4. Former Article 27 § 36B (d) is now recodified at C.L. § 4–204(a).

Article 27. We disagree. As the Court of Appeals has explained:

> [T]he maxim "expressio unius est exclusio alterius" . . . meaning that the expression of one thing implies the exclusion of another thing not mentioned, is not a rule of law, but merely an auxiliary rule of statutory construction applied to assist in determining the intention of the Legislature where such intention is not manifest from the language used. It should be used with caution, and should never be applied to override the manifest intention of the Legislature or a provision of the Constitution. . . .

*Walzer v. Osborne*, 395 Md. 563, 579, 911 A.2d 427 (2006) (citation omitted).

We have already concluded that the plain language of P.S. § 5–101(h) does not include a requirement of operability, thus this maxim does not apply. Additionally:

> Of import here, we are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. When "appropriate," we interpret a provision "in the context of the entire statutory scheme of which it is a part." Put another way, when a provision "is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature."

*Nelson v. State*, 187 Md.App. 1, 12, 975 A.2d 298 (2009) (citations omitted).

Looking to the Maryland Gun Violence Act of 1996 as a whole, we conclude that the Legislature sought to reduce gun-related violent crime in Maryland, as well as diminish the proliferation of illegal sales and possession of regulated firearms. Those goals are not necessarily mutually exclusive.

Moreover, it is clear that the Legislature intended to treat certain classes of individuals who illegally possess regulated firearms differently than those that merely illegally possess a handgun. For instance, when in 1996 the Legislature added former Article 27 § 445, since recodified at P.S. § 5–133, it provided a list of certain individuals completely prohibited

from possessing a regulated firearm. Those included anyone convicted of a crime of violence, a felony, or certain misdemeanors. *See* Md.Code (1957, 1996 Repl.Vol.), § 445(d) of Article 27 (superseded). Also prohibited are fugitives, habitual drunkards, persons addicted to controlled dangerous substances, persons with certain mental disorders, persons subject to a non ex parte civil protective order, and, with certain exceptions, minors. *See* Md.Code (1957, 1996 Repl.Vol.), §§ 445(d), (e) of Article 27 (superseded). These classifications provide a clear distinction between the regulated firearms statute and the handgun statutes.

Furthermore, the penalties for illegal possession under those respective provisions are also markedly different. Pursuant to the Act, the possible penalties following a conviction of illegally possessing a regulated firearm included a fine of $10,000, imprisonment for not more than 5 years, or both. *See* Md.Code (1957, 1996 Repl.Vol.), § 449(e) of Article 27 (superseded). In contrast, the existing range of penalties for a first offense of unlawful wearing, carrying, or transporting a handgun included a fine of between $250 and $2,500, imprisonment of not less than 30 days nor more than three years, or both. *See* (1957, 1996 Repl.Vol.), § 36B (b)(i) of Article 27 (superseded).[5]

Additionally, our reading of the meaning of "firearm" under the handgun statutes is not inconsistent with our interpretation in this case. We summarized that law in *Powell v. State*, 140 Md.App. 479, 780 A.2d 1219, *cert. denied*, 367 Md. 90, 785 A.2d 1292 (2001). There, Powell had been charged with unlawful wearing, carrying or transporting a handgun under

---

5. If one was convicted of wearing, carrying or transporting a handgun on any public school property, the mandatory minimum was imprisonment for not less 90 days. *See* Md.Code (1957, 1996 Repl.Vol.), § 36B (b)(i) of Article 27 (superseded). Under current law, the possible penalties for unlawful wearing, carrying or transporting a handgun remain unchanged. *See* C.L. § 4–203(c)(2) (2002, 2008 Supp.). However, illegal possession of a regulated firearm by a disqualified person is now a felony, and the possible penalties have increased such that upon conviction, the person is subject to a mandatory minimum sentence of five years without possibility of parole. *See* P.S. § 5–133(c)(2), (3).

former Article 27 § 36B (b), recodified at C.L. § 4–203. Powell contended at trial that he could not be convicted of that offense because the .32 caliber semi-automatic pistol recovered by police was "not operable or readily operable so as to qualify as a firearm." *Powell*, 140 Md.App. at 482, 780 A.2d 1219. This Court set forth the pertinent law:

> Section 36F (b) defines a "handgun" as "any pistol, revolver, or other firearm capable of being concealed on the person."
>
> In *Howell v. State*, 278 Md. 389, 396, 364 A.2d 797 (1976), the Court of Appeals held that for a weapon to meet the definition of a handgun under article 27 *§§ 36B (b)* and 36F (b), "it must be a firearm or it must be readily convertible into a firearm," that is, "a gun which could be explosive of projectiles." (Emphasis added, internal quotations omitted.) In *Wright v. State*, 70 Md.App. 616, 522 A.2d 401 (1987), we explained that there are two aspects to this definition. First, it excludes weapons not designed or constructed to fire missiles by gaseous explosion, and incapable of doing so because of their design and construction. Second, it requires even a weapon designed and constructed as a firearm to be capable of actually discharging a missile. *Id.* at 620, 522 A.2d 401 . . . .

*Powell*, 140 Md.App. at 483, 780 A.2d 1219.[6]

In *Powell*, the pistol would not fire unless a proper magazine was inserted into the weapon. *Id.* In considering whether such a weapon could be "readily convertible into a firearm," we considered *York v. State*, 56 Md.App. 222, 467 A.2d 552 (1983), *cert. denied*, 299 Md. 137, 472 A.2d 1000 (1984). *Powell*, 140 Md.App. at 483–84, 780 A.2d 1219. There, the weapon used in a robbery was so damaged the cylinder would not

---

6. In *Howell, supra*, the Court of Appeals concluded that a tear gas gun was not a handgun because tear gas is "not a missile within the natural and ordinary signification of the term." *Howell*, 278 Md. at 396, 364 A.2d 797. In *Wright, supra*, we concluded the trial court erred in its instructions concerning the definition of a handgun, because there was a genuine dispute over whether that weapon was operable, given that it did not fire when Wright pulled the trigger during an armed robbery. *Wright*, 70 Md.App. at 621–22, 522 A.2d 401.

revolve, therefore, a ballistics report classified the weapon as "inoperable." *York,* 56 Md.App. at 227, 467 A.2d 552. However, a police firearms expert testified "that by using a hammer and a screwdriver or a fingernail file he could restore the weapon to operable condition in about a minute's time." *Id.* We concluded that the weapon met the definition of a firearm because it could be readily converted to that purpose. *Id.* at 230, 467 A.2d 552. We stated:

> The weapon used in this case (unlike the tear gas gun in Howell) had been designed, manufactured and presumably sold as a firearm. The infliction of death or serious bodily harm was its *raison d'etre.* The only factor detracting in any degree from its ability to perform that lethal function was a minor mechanical defect correctable in about a minute by the use of simple tools. . . .
>
> . . . We do not think the legislature, in its concern for the protection of citizens against handguns used in crimes, intended a weapon to be excluded from the handgun category because of nice calculations of percentages or the relative strengths of potential users.

*York,* 56 Md.App. at 230, 467 A.2d 552 (citations omitted).[7]

In *Powell,* we relied on this precedent, as well as persuasive out-of-state authority, and upheld Powell's conviction for unlawful wearing, carrying or transporting a handgun. *Powell,* 140 Md.App. at 486–87, 780 A.2d 1219. We stated, *id.* at 486, 780 A.2d 1219:

---

**7.** We noted in *York* that the definition that applied was the one pursuant to Section 36B (f), "and not the broader definition contained in Art. 27 § 441(c)." *York,* 56 Md.App. at 229 n. 1, 467 A.2d 552 (citing *Tisdale v. State,* 30 Md.App. 334, 343, 353 A.2d 653 (1976)). We think the meaning of this footnote is clear considering the case citation to *Tisdale, supra.* There, the gun that formed the basis of Tisdale's handgun violation was a blank gun. *Tisdale,* 30 Md.App. at 341, 353 A.2d 653. We held that the trial court erred by instructing the jury using the definition provided by Article 27 § 441, which included guns, starter guns, or blank pistols, when the definition under Section 36F, which did not include any reference to blank pistols, actually applied to the underlying offense. *Tisdale,* 30 Md.App. at 343, 353 A.2d 653.

In *York,* the weapon in question was damaged. In deciding whether it was readily convertible to a firearm, this Court emphasized that the weapon had kept its initial characteristics as a firearm and could be made to fire with a simple correction or adjustment. In the case at bar, the weapon was not damaged; rather, it was missing a part necessary to make it fire. Once the part was available, however, the weapon readily could be made to fire—just as the weapon in *York* readily could be made to fire with a simple correction or adjustment.

Looking to *Howell, York,* and *Powell,* it is clear that whether a handgun is a "firearm" depends upon whether the weapon functioned as a firearm or could "be readily convertible into a firearm." *Howell,* 278 Md. at 396, 364 A.2d 797. This definition is not so far removed from the definition in P.S. § 5–101(h), which defines "firearm" as "a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive." P.S. § 5–101(h)(1)(i). Thus, even under the handgun statutes, we have declined to apply the bright line rule appellant wants us to apply to the regulated firearm statute.

In sum, the circuit court properly denied appellant's motion *in limine* to exclude the weapon based on the plain language of P.S. § 5–101(h). Further, given the legislative history of the Maryland Gun Violence Act of 1996, the Legislature clearly intended this definition to be read consistent with federal law. Therefore, "firearm" under Section 5–101(h) includes both operable and inoperable weapons where the weapon functions as a firearm, is designed to function as a firearm, or is readily convertible into a firearm.

## II.

■ Appellant next contends that the evidence was insufficient to sustain his conviction on the agreed statement of facts, because the weapon recovered in this case could not be "readily converted to expel a projectile by the action of an explosive." We disagree.

Here, the parties agreed that the gun had one loaded round in the cylinder when it was recovered. Although the gun was never test fired in its original condition, the gun "would have fired in some way. Whether the bullet went sideways, forward or backward is still open to conjecture." Thus, the parties agreed that the gun would have gone off, but that the expert fixed the gun for his own safety.

Notwithstanding these repairs, the parties further agreed that the gun was "a handgun with a barrel less than 16 inches in length, and it expels—is designed to expel or may readily be converted to expel a projectile by action of an explosive, and at a minimum is certainly also a frame of such a weapon." Finally, when questioned by the court, defense counsel agreed that the weapon "was designed, in fact, to propel a projectile."

Ultimately, defense counsel's argument was that the gun was never test fired by the expert in its original condition. However, where the parties agreed the weapon was designed to expel a projectile, included the frame of the weapon, and that it did fire after the expert performed certain repairs, given other evidence in the record, we hold that a rational trier of fact could look to these agreed facts and conclude that appellant was guilty beyond a reasonable doubt of illegal possession of a regulated firearm by a person previously convicted of a disqualifying offense.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**